LEWIS H. SPENCE, receiver, *vs.* FRANCES GORMLEY
(and a consolidated case[1]).

Suffolk.  May 4, 1982. — August 26, 1982.

Present: HENNESSEY, C.J., WILKINS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Boston Housing Authority.  Housing.  Intentional Conduct.  Due Process of Law,* Housing, Liability for acts of another, Burden of proof. *Parent and Child.*

Eviction of a tenant of a public housing project because of acts of violence committed at the project by a member of the tenant's household, in the absence of special circumstances indicating that the tenant could not foresee or prevent the violence, did not violate the tenant's lease, the statute governing termination of public housing tenancies, or the requirements of due process of law.  [261-273]

In proceedings to evict a tenant from a public housing project on the basis of violent acts by a member of the tenant's household, the ordinary civil standard of proof by a preponderance of the evidence is sufficient. [273-277]

In a summary process action to evict a tenant from a public housing project because of violent acts committed by the tenant's son, there was sufficient evidence to warrant the judge's finding that the son had participated in the firebombing of an apartment in the project. [277-279]

CIVIL ACTIONS commenced in the Boston Division of the Housing Court Department on April 24, 1981, and May 22, 1981, respectively.

The cases were heard by *King,* J.

The Supreme Judicial Court granted a request for direct appellate review.

*Jane D. Kaplan (Diana J. Rubin* with her) for Frances Gormley.

*R. J. Cinquegrana* for Beatrice Bunting.

---

[1] Lewis H. Spence, receiver, *vs.* Beatrice Bunting.

*Richard Friedman (Richard M. Bluestein* with him) for Lewis H. Spence.

HENNESSEY, C.J.   In each of the cases before us, the Boston Housing Court entered a judgment evicting a tenant of the Boston Housing Authority (BHA) on the basis of violent acts by the tenant's son, a member of the household at the time of the alleged violence.   We affirm the judgments granting possession to the BHA.

Similar eviction procedures were followed in the two cases.   The BHA first held a conference with the tenant to discuss the alleged conduct of her son.   The conference was followed by a grievance hearing before a BHA panel, which voted to terminate the tenancy.[2]   The BHA gave the tenant notice to quit, and initiated proceedings in the Housing Court for summary eviction.   Each trial resulted in judgment for the BHA.   The tenants appealed, and we granted the BHA's request for direct appellate review.

We summarize the findings on which each judgment was based.[3]   In the first case, the BHA sought to evict Frances Gormley from the Faneuil development in Brighton on the basis of two incidents involving her son Mark McDonough. The judge found that on May 11, 1980, Mark participated in firebombing the apartment of a black tenant at Faneuil. He also found that on July 17, 1980, Mark assaulted a black BHA employee.   The assault was racially motivated and "totally unprovoked."   Mark was sixteen at the time of these

---

[2] The BHA cannot, of course, "evict" a tenant without the aid of the summary process statute, G. L. c. 239, § 1, which authorizes a person legally entitled to possession of land or tenements to bring an action to recover possession.   See G. L. c. 184, § 18.   The outcome of the summary process action depends on whether the tenancy has validly been terminated, which depends in turn on the meaning and validity of the termination provisions of the lease.   See *Boston* v. *Talbot,* 206 Mass. 82, 92-93 (1910).

[3] Each tenant questions the sufficiency of the finding that her son committed the acts charged.   In addition, Mrs. Bunting disputes a finding that she knew or had reason to know of her son's propensity for violence, and a finding that her son's conduct was racially motivated.   We address these arguments, to the extent necessary, in the later sections of this opinion.

incidents, and was living in his mother's household at Faneuil. The judge made no findings as to whether Mrs. Gormley knew or should have known of her son's propensity for violence, or whether she was able to control or prevent his actions.

Mrs. Gormley's household now consists of herself, her husband, and her younger son Scott. Mark is serving the second year of a six-to-ten year prison sentence for acts unrelated to the firebombing and assault at Faneuil. Mrs. Gormley has stated her intention to exclude Mark from her household after his release from prison. Mark, however, has stated that he intends to return to his mother's home.

In the second case, the BHA sought to evict Beatrice Bunting from the West Broadway development in Boston on the basis of a firebombing by her son William Bunting. The judge found that on November 7, 1980, William participated in firebombing the apartment of a tenant at Broadway, and that the incident was racially motivated. William was eighteen when the firebombing occurred. Between the ages of eleven and eighteen he had been in the custody of the Division of Youth Services (DYS), visiting his mother's home only once a month. At the time of the firebombing, however, William had been released from DYS custody, and was living, at least sporadically, in his mother's household at West Broadway. The judge found that Mrs. Bunting knew or should have known of her son's violent tendencies, but had no ability to control his actions.[4] Mrs. Bunting's household now consists of herself, William, and three other children.

Apart from questions of sufficiency of evidence, the two tenants' arguments are essentially the same. They argue, first, that their leases do not authorize termination on the

---

[4] The judge allowed Mrs. Bunting's requests for findings that she did not know or have reason to know her son (1) would commit the act charged or (2) intended to commit violent acts against the residents of the firebombed apartment. He found, however, that Mrs. Bunting "knew or should have known of her son's violent tendencies particularly with reference to the occupants of [the firebombed] apartment."

basis of acts by anyone other than the tenants named in the lease. Alternatively, the tenants argue that principles of due process prevent eviction of tenants who are not "personally culpable" of wrongdoing. They suggest that an element of scienter, and an ability to control the wrongdoer's conduct, are constitutional prerequisites of eviction on the basis of another's acts. Finally, the tenants argue that the events justifying eviction must, as a matter of procedural due process, be proved by clear and convincing evidence.

We decide, first, that the leases permit termination on the basis of acts by household members. We then depart from the path followed by the parties, and consider the statute governing termination of public housing tenancies, G. L. c. 121B, § 32. We read § 32 to provide a limited protection against termination when special circumstances, not present in these cases, indicate that the tenant could not have foreseen the violence or taken steps to prevent it. We then conclude that, at least within the limits set by § 32, eviction of tenants from public housing on the basis of violent acts by a household member is consistent with due process. Finally, we determine that the BHA was not required to prove by clear and convincing evidence that members of the tenants' household committed the acts charged, that the evidence in each case was sufficient to support eviction, and that the judgments granting possession to the BHA should be affirmed.

1. *Lease Provisions.*

Mrs. Gormley and Mrs. Bunting signed identical lease forms. Each signed as "tenant," and no other "tenants" signed or were named. The lease form was the product of collective bargaining between the BHA and the Boston Public Housing Tenants' Policy Council, Inc.

The leases identify ten permissible grounds for termination of the tenancy by the BHA, three of which bear upon the present cases. "This lease may be terminated by the [BHA] . . . for no reason other than . . . 2. Reasonable likelihood of serious repeated interference with the rights of other tenants. . . . 5. Creation or maintenance of a serious

threat to the health or safety of other tenants. . . . 10. In the event of a violation by the Tenant of any of the terms, conditions or covenants of this lease." In addition, the lease specifies "tenant obligations," including an agreement to "[l]ive in a peaceful way, respecting the rights of his neighbors to privacy and quiet."

Firebombings of other BHA apartments are certainly within the scope of conduct for which eviction is authorized. Such extremely violent acts constitute a threat to the health and safety of tenants, and raise a likelihood of repeated interference with tenants' rights. A violent, unprovoked assault against a BHA employee also affects the rights of project residents and, particularly when preceded by a firebombing, suggests a likelihood that more violence will ensue.

The more important question is whether the termination provisions cover conduct by household members other than the named tenant who has signed the lease. We believe they do. The language of the termination provisions speaks only of the facts that justify eviction — a threat to health and safety or a likelihood of interference with rights. This wording suggests that if these problems arise from the tenancy, eviction is warranted, whether the wrongdoer is the tenant or a member of her household. Moreover, an interpretation of the lease to cover the conduct of all household members is consistent with the manifest purpose of the termination provisions, to promote safety and order in the housing projects. This objective is shared alike by the BHA and its tenants, and has fallen far short of successful accomplishment.[5]

We stated in *Spence v. Reeder*, 382 Mass. 398, 421 (1981), that at least when a tenant knows or has reason to know of

[5] See *Spence v. Reeder*, 382 Mass. 398, 402 (1981), in which we summarized findings that "[a] state of emergency relative to safety and security existed in many BHA developments. The emergency was 'worsened' by acts of violence by certain tenants against other tenants and against BHA employees and property and by other illegal conduct. Many acts of violence appeared to be racially motivated."

a household member's violent tendencies, "[t]he notion that interference with or threats to the rights of other tenants justifying eviction can only come from a signatory of the lease (or his or her minor children) is itself illogical. Surely, a public housing authority cannot be left helpless to rectify a serious threat to the safety of other tenants simply because the signatory of the lease happens not to be the source of the threat." Although we were concerned in *Spence*, not with construction of a lease, but with general questions of fairness, our comments there are relevant to the likely intent of parties seeking to provide rationally for a means to curtail rampant violence in the housing projects.

2. *Statutory Requirement of Cause.*

The tenants argue that, even if the BHA was entitled under the terms of the lease to terminate their tenancies on the basis of their sons' conduct, it could not do so without proof that they were personally responsible for their sons' violent acts. Although the tenants have based their claims primarily on the requirements of the Federal Constitution, we consider first the statutory provisions governing termination of public housing tenancies. We conclude that these provisions permit the BHA to terminate a tenant's lease on the basis of violent conduct by a household member, unless the tenant can point to special circumstances indicating that she could not foresee or prevent the violence.

General Laws c. 121B, § 32, provides that a housing authority cannot terminate a tenancy without "cause." "Cause," as a limit on administrative discretion, imposes requirements of rationality and basic fairness on agency action. It is a general term, and must take on much of its meaning from the context in which it is used. See *Driscoll* v. *Harrison*, 11 Mass. App. Ct. 444, 448 (1981). It does not imply that agency action must be predicated on the fault or undesirable conduct of the person affected; cause may arise, for example, from external economic constraints upon the agency. See, e.g., *Dooling* v. *Fire Comm'r of Malden*, 309 Mass. 156, 162 (1941). For reasons cited in our discussion of the lease clauses, we believe that violent acts by house-

hold members can constitute "cause" to terminate a tenancy.[6]

At the same time, two circumstances lead us to conclude that, when termination is based on prohibited conduct by a tenant's household member, "cause" requires that there be some connection between the tenant and the conduct underlying the termination. The first influential circumstance is the severity of the consequences of eviction. See *Caulder v. Durham Hous. Auth.*, 433 F.2d 998, 1003 (4th Cir. 1970), cert. denied, 401 U.S. 1003 (1971); *McQueen v. Druker*, 317 F. Supp. 1122, 1130 (D. Mass. 1970), aff'd, 438 F.2d 781 (1st Cir. 1971). The BHA's housing developments provide housing of last resort. Admission is conditioned on serious need. G. L. c. 121B, § 32. A determination to evict entire families for acts that they could not avert by any means, while it might not be arbitrary or irrational in the constitutional sense,[7] is nevertheless contrary to the concept of fair and reasonable treatment implicit in the requirement of "cause."

A second, perhaps related, circumstance is the presence of unsettled constitutional questions. As will be seen, we are not persuaded that "personal responsibility" is a constitutional prerequisite to eviction for the acts of household members. Nevertheless, we prefer to read the statute in a way that will avoid constitutional doubts. See, e.g., *Worcester County Nat'l Bank v. Commissioner of Banks*, 340 Mass. 695, 701 (1960).

---

[6] This was reaffirmed by an amendment to § 32, added after the present cases arose. The amendment provides for expedited eviction procedures when "there is reasonable cause to believe that the tenant *or a member of the tenant's household*" has committed certain acts, including possession or use of an explosive or incendiary device on or near a housing project. G. L. c. 121B, § 32, as amended through St. 1981, c. 510 (emphasis added). The inclusion of acts by household members among the types of conduct singled out for expedited treatment clearly indicates that the Legislature viewed such acts as "cause" for termination. See *Weston v. Maguire*, 10 Mass. App. Ct. 540, 541 (1980).

[7] See *infra*, part 3 (a).

This is not to say that we endorse, in our construction of § 32, the tenants' proposal that the BHA cannot terminate their tenancies without affirmative proof that they knew or had reason to know of their sons' violent propensities, and were able to control their sons' conduct. Cf. *Caldwell* v. *Zaher*, 344 Mass. 590, 592 (1962).[8] The requirement we discern in § 32 is not so broad. When the wrongdoer is a household member, a fair inference exists that the tenant is aware of potential problems, and able to exercise some influence or otherwise prevent violent and destructive conduct on the premises. Problems of unfairness arise only because this may not hold true in every case. Accordingly, we understand the "cause" requirement of § 32 simply to mean that a tenant should not be evicted if special circumstances are present to negate the inference that she could have averted the lease violation. In other words, if the tenant can show that she could not have foreseen and prevented her son's violence, there is no "cause" to evict her within § 32.

The evidence in the present cases does not negate the inference of awareness of and ability to prevent violence. Neither tenant identified circumstances, such as the wrongdoer's very young age or prior record of good conduct, that

---

[8] *Caldwell* v. *Zaher*, 344 Mass. 590, 592 (1962), stated the rule that a parent is not vicariously liable for the torts of a child unless "the parent knows or should know of the child's propensity for the type of harmful conduct complained of, and has an opportunity to take reasonable corrective measures." See *Sabatinelli* v. *Butler*, 363 Mass. 565, 568-571 (1973); *DePasquale* v. *Dello Russo*, 349 Mass. 655, 657-659 (1965). The tenants' reliance on these tort decisions is misplaced. First, the Legislature has since enacted a statute, G. L. c. 231, § 85G, as appearing in St. 1979, c. 172, that holds parents liable for "any willful act committed by [an unemancipated child under age eighteen] which results in injury or death to another person or damage to the property of another," apparently without regard to the parents' scienter or opportunity for control. Further, the question of eviction from public housing on the ground of acts by household members that endanger the safety and property of other tenants is quite different from that of compensation for the victims of children's torts, and we do not consider either G. L. c. 231, § 85G, or prior decisions on vicarious liability, as determinative of the issues in this case.

might have made violent conduct unforeseeable. In fact, there was in each case some prior warning of trouble.[9] Nor were there any facts suggesting that the tenants were completely unable to take any measures to prevent violence. Mrs. Bunting testified, and the judge in her case found, that she was unable to control her son's actions. A tenant's ability to avert violent conduct by a household member on housing authority premises, however, extends beyond the power actually to control his conduct by force or persuasion. If the potential offender is a minor child, the tenant could seek counselling, temporary substitute care or other forms of aid through the Department of Social Services. See, e.g., G. L. c. 119, §§ 23(A), 39E. If an adult member of the household is uncontrollable and likely to commit serious acts of violence, the tenant reasonably could refuse to permit him to stay with her, and could seek outside help in preventing his continued presence. When a tenant has taken such measures, she has done all she can, and should not be held responsible for violence that nevertheless occurs. Here, however, neither tenant appears to have taken any steps to prevent the violence and destruction that led to her eviction.

3. *Constitutional Claims.*

a. *Personal responsibility.* We turn now to the tenants' argument that the BHA could not constitutionally terminate their tenancies without proof that they were responsible for their sons' acts. The tenants' claims to constitutional protection reach beyond the relief provided by our construction of G. L. c. 121B, § 32. Both tenants would re-

---

[9] William Bunting had a long history of delinquent conduct, and Mrs. Bunting had been warned by the woman whose apartment was firebombed that members of the Bunting household had been vandalizing the apartment. Mrs. Gormley's son Mark McDonough is alleged to have participated in two violent incidents; a firebombing on May 11, 1980, and an assault against a BHA employee on July 17, 1980. Mark's arrest for the firebombing on May 13 should have alerted Mrs. Gormley to the possibility of violence.

quire the BHA to prove that they knew or had reason to know of their sons' violent tendencies, and were able to control the sons' conduct, and Bunting appears to argue that some form of actual involvement or complicity must be shown.[10] We believe that the tenants have overstated constitutional requirements, and that G. L. c. 121B, § 32, as construed, is fully consistent with due process.

The tenants' claims are based on a perceived principle of substantive due process[11] protecting individuals against punishment without "personal guilt." As evidence of this principle, they point to various statements of the United States Supreme Court indicating that government cannot impose legal burdens solely on the basis of a status or association of the burdened individual. In *Weber* v. *Aetna Cas. & Sur. Co.*, 406 U.S. 164, 175 (1972), for example, the Court, discussing denial of worker's compensation benefits to illegitimate children, stated that "imposing disabilities on the illegitimate child is contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing." See, in addition,

---

[10] The judge presiding at Gormley's trial made no findings with respect to scienter or ability to control. The judge at Bunting's trial found that Bunting had reason to know of her son's propensity for violence, but had no control over his actions.

[11] Many courts have held that the tenants have constitutionally protected property interests in their tenancies, and so are entitled to fair procedures to determine whether their protected interests have been infringed. E.g., *Lopez* v. *Henry Phipps Plaza South, Inc.*, 498 F.2d 937, 943 (2d Cir. 1974); *Caulder* v. *Durham Hous. Auth.*, 433 F.2d 998, 1002-1003 (4th Cir. 1970), cert. denied, 401 U.S. 1003 (1971). See generally *Vitck* v. *Jones*, 445 U.S. 480, 488-491 (1980); L. Tribe, American Constitutional Law 522-563 (1978). It is a different question, however, whether the due process clause of the United States Constitution places substantive limits on the BHA's, and the Legislature's, ability to define the boundaries of the tenant's interest. Substantive restrictions on government action have been based only on explicit constitutional guarantees, or on the most fundamental concepts of dignity and justice in the relationship between government and individual. See generally *Moore* v. *East Cleveland*, 431 U.S. 494, 541-551 (1977) (White, J., dissenting); L. Tribe, *supra* at 889-896. We are, then, on sensitive ground, and proceed with restraint.

*Plyler* v. *Doe*, 457 U.S. 202 (June 15, 1982) (holding unconstitutional a statute denying public education to children of illegal aliens); *Wieman* v. *Updegraff*, 344 U.S. 183, 191 (1952) (holding unconstitutional a loyalty oath, required for public employment, that covered innocent as well as knowing membership in subversive organizations). Cf. *Robinson* v. *California*, 370 U.S. 660, 667 (1962) (criminal penalty for narcotics addiction, an "illness" that can be acquired involuntarily, is cruel and unusual punishment barred by Eighth and Fourteenth Amendments); *Lambert* v. *California*, 355 U.S. 225, 227-230 (1957) (law requiring convicted felons to register with local authorities is unconstitutionally applied when defendant had no actual or probable knowledge of duty to register). The specific phrase, "personal guilt," derives from a statement by Justice Harlan in *Scales* v. *United States*, 367 U.S. 203 (1961), a decision upholding a conviction under the Smith Act for knowing and active membership in an organization advocating violent overthrow of the government. "In our jurisprudence guilt is personal, and when the imposition of punishment on a status or on conduct can only be justified by reference to the relationship of that status or conduct to other concededly criminal activity . . . that relationship must be sufficiently substantial to satisfy the concept of personal guilt in order to withstand attack under the Due Process Clause of the Fifth Amendment." *Id.* at 224-225.

Several lower Federal courts have applied the concept of "personal guilt" described by Justice Harlan in civil contexts, including that of eviction from public housing. *Tyson* v. *New York City Hous. Auth.*, 369 F. Supp. 513, 518-519 (S.D.N.Y. 1974) (holding unconstitutional evictions based on the conduct of adult children not living in the tenants' households at the time of the wrongful conduct). See *St. Ann* v. *Palisi*, 495 F.2d 423, 425-428 (5th Cir. 1974) (holding unconstitutional suspension of children from public school because of mother's conduct toward school officials). Other courts, however, have upheld termination of public housing tenancies on the basis of conduct by house-

hold members, without requiring proof of the evicted tenant's scienter or ability to control the wrongdoer's conduct. See *Lopez* v. *Henry Phipps Plaza South, Inc.*, 498 F.2d 937, 946 (2d Cir. 1974) (distinguishing *Tyson* v. *New York City Hous. Auth.*, *supra*, on ground that all wrongdoers were household members and one was a named tenant); *Housing Auth. of Atlanta* v. *Davis*, 158 Ga. App. 600 (1981); *Tompkins Square Neighbors, Inc.* v. *Zaragoza*, 43 App. Div. 2d 551 (1973), appeal dismissed, 34 N.Y.2d 737 (1974); *Portugues* v. *Golar*, 75 Misc. 2d 893 (N.Y. Sup. Ct. 1973); *Housing Auth. of Portland* v. *Bahr*, 25 Or. App. 117 (1976).

The problems that have prompted the Supreme Court to speak of personal responsibility, or "guilt," are distinguishable from the present cases. They have involved criminal penalties inhibiting political association, e.g., *Scales* v. *United States*, *supra*, arbitrary classifications, e.g., *Plyler* v. *Doe*, *supra*, or other particular forms of injustice that can be limited to the facts presented, e.g., *Robinson* v. *California*, *supra* (criminal penalties for illness). The tenants here have not identified an impermissible classification, or, apart from the asserted punishment without responsibility, an intrusion upon individual rights. Cf. *Bryan* v. *Kitamura*, 529 F. Supp. 394, 398-402 (D. Haw. 1982) (statute imposing strict vicarious liability on parents for children's torts infringes no fundamental right, and draws no suspect classification).

Despite these points of distinction, we are willing to assume that the Court's various statements reflect a principle that punitive action must be based on personal responsibility. In other words, when the only justification for a legal burden, penalty, or classification is to punish or deter conduct, the burden cannot fairly be imposed on individuals who have no means of avoiding it. If punishment or deterrence is directed toward individuals who cannot affect the offending conduct, it is illogical. If it is directed toward the wrongdoer, whom the government hopes to reach through its action toward those close to him, it may be logical and

effective, but it may also be contrary to basic justice. See *Plyler* v. *Doe, supra,* at 220; *Weber* v. *Aetna Cas. & Sur. Co., supra* at 175.

We believe, however, that the tenants have conceived this concept of personal responsibility too broadly in their attempt to apply it to the present cases. First, we doubt that it has any application when the imposition is supported by reasons of public health, safety, or welfare, apart from mere deterrence of others' conduct. Action against individuals in a particular position often may contribute directly and significantly to the solution of a problem of health, safety, or welfare despite the fact that the burdened individuals have not, by any act or omission, caused the problem. Examples can be found in the operation of zoning regulations, see, e.g., *Pierce* v. *Wellesley,* 336 Mass. 517, 522-523 (1957), or workers' compensation laws, see, e.g., *Caswell's Case,* 305 Mass. 500, 502 (1940). In such a case, there is a legitimate connection between the individual and the imposition, beyond the mere possibility that he can be used to influence another. Unless the government action in question involves an improper classification, or encroaches on constitutionally protected substantive rights, the balance of affected interests is best left to the judgment of legislative and administrative bodies, and the constitutional issue narrows to one of rational relationship between means and ends. See *Bogan* v. *New London Hous. Auth.,* 366 F. Supp. 861, 867-870 (D. Conn. 1973). See also *Bryan* v. *Kitamura,* 529 F. Supp. 394, 398-400 (D. Haw. 1982) (upholding strict parental liability for child's tort); *Board of Educ. of Piscataway Township* v. *Caffiero,* 86 N.J. 308, 317-320, appeal dismissed, 454 U.S. 1025 (1981), and cases cited (same). Cf. *Williamson* v. *Lee Optical of Okla., Inc.,* 348 U.S. 483, 487-488 (1955); *Nebbia* v. *New York,* 291 U.S. 502, 537-539 (1934); *Miller* v. *Schoene,* 276 U.S. 272, 279-280 (1928).

The BHA's purpose is clear, and certainly legitimate. It seeks to promote safety in the housing projects. It suggests two ways in which eviction of the Gormley and Bunting

families on the basis of violent acts by household members, without inquiry into the tenants' ability to foresee or control the violence, would further this purpose. The first is deterrence; other destructive children, realizing the consequences that their violence might visit on their families, would be less likely to engage in violent conduct. For reasons we have stated, we assume that this reasoning alone will not support the BHA's action. An attempt to deter one person through harm or threat of harm to those close to him may, despite its possible effectiveness, controvert principles of due process.

The BHA presents a second, more persuasive justification for eviction of the wrongdoer's family. Prompt and complete removal of a violent resident is an effective means of preventing further violence. The continued presence of the wrongdoer's household, however, is likely to attract him to the project. Evicting the entire household minimizes the possibility of return. The tenants propose alternative ways to keep the wrongdoer away from the housing projects, such as an agreement conditioning the mothers' continued tenancy on their prevention of the sons' return, or an injunction.[12] Such measures, however, might be difficult to enforce, and would leave open the possibility of another round of violence before the final solution of eviction could be imposed. Further, enforcement could draw the BHA far into regulation of family life. Cf. *McKenna* v. *Peekskill Hous. Auth.*, 647 F.2d 332, 335 (2d Cir. 1981) (requirement that tenants disclose and obtain management approval for overnight guests invaded tenants' privacy). In any event, the Legislature, or the BHA, is not bound to choose the best or gentlest of methods to achieve the objective of safe housing. See *Williamson* v. *Lee Optical of Okla., Inc.*, 348 U.S. 483, 487-488 (1955). In some circumstances, eviction of tenants on the ground that they will attract undesirable visitors

---

[12] Gormley suggests that in the case of her son, who is in prison, parole could be conditioned on his not returning to the project. The BHA, however, has no control over the terms of his parole.

might cross the line of rationality. If the wrongdoer were dead, or confined for an extended period of time, eviction would serve no purpose. If the unwanted visitor were not a household member, the likelihood that the tenant's presence would attract him to the project might be too slight to sustain the eviction. Cf. *Tyson* v. *New York City Hous. Auth.*, 369 F. Supp. 513, 518-519 (S.D.N.Y. 1974). But when a household member has committed serious acts of violence, and is likely to return in the reasonably near future, eviction may be an effective safety measure.[13]

Eviction might seem a harsh measure when applied to tenants who had done what they could to prevent violence by household members. We have assumed, in construing the general requirement of "cause" in G. L. c. 121B, § 32, that the Legislature intended to provide some relief in such a case. But even if the statute permitted eviction of tenants who could not have foreseen or affected the conduct of household members, and so bore no degree of personal responsibility, we would hesitate to hold the eviction was unrelated to safety or otherwise beyond the power of the Legislature.

Our construction of § 32, however, provides an alternative and more definite reason to uphold evictions based on acts by household members. Even if we assume that the government is restrained by a requirement that all legal burdens — even those that directly serve public health, welfare, or safety — must be based on personal responsibility, that requirement is satisfied by the "cause" requirement of § 32, as we have construed it. In the relationship of a tenant to a member of her household, particularly a child, the natural inference that the tenant is aware of and able to

---

[13] Mrs. Gormley's son, Mark McDonough, is now serving a six-to-ten year prison sentence. The judge nevertheless determined that Mark might return to Faneuil "in the near future." This conclusion was based on consideration of Mark's sentence (six-to-ten years), time already served (more than a year), and the possibilities of parole under G. L. c. 127, § 133 (after two-thirds, or possibly one-third, of the minimum sentence), special credits, and furloughs.

prevent potential misconduct, qualified by an opportunity to prove otherwise, provides a substantial connection between the relationship (tenant-household member) and the conduct that is the target of government action. See *Scales v. United States, supra.* Contrast *Tyson v. New York City Hous. Auth.,* 369 F. Supp. 513, 519 (S.D.N.Y. 1974) ("causal nexus" necessary to support eviction lacking when son was not living in mother's household). We believe that this rebuttable inference of responsibility fully satisfies the requirements of due process.[14] Contrast, e.g., *United States Dep't of Agriculture v. Murray,* 413 U.S. 508, 511 (1973) (statute making household ineligible for food stamps if one member is over eighteen and has been claimed by another person as a tax dependent creates "conclusive presumption" that the household is not needy).

The element of personal responsibility encompassed by § 32 also adds to the connection between eviction and legitimate government purposes. As construed, § 32 serves to encourage tenants to attempt to guide the conduct of household members, and to seek help when they are unable to. Thus, there is additional reason to conclude that an eviction under § 32 is not an arbitrary measure.

b. *Standard of proof.* The tenants argue that principles of procedural due process require particularly strong proof that members of their households committed the acts of violence on which the evictions are founded. In each case, the judge applied the ordinary civil standard of proof by a "preponderance" of evidence. The tenants insist that the proper standard was at least that of "clear and convincing" proof, if not that of proof "beyond a reasonable doubt." We conclude that no special standard of proof was necessary.

---

[14] A significant body of accepted law imposing legal burdens without fault negates the possibility that due process requires that government action be based on culpability or carelessness. See *Lambert v. California,* 355 U.S. 225, 230-231 (1957) (Frankfurter, J., dissenting); *Morrisette v. United States,* 342 U.S. 246, 252-259 (1952). Thus, the problem is at most one of *responsibility,* in the sense of some contribution or connection on the part of the individual to undesirable acts or omissions.

The standard of proof is an element of the minimum procedural due process required in proceedings affecting protected "liberty" or "property" interests. *Santosky* v. *Kramer*, 455 U.S. 745, 755-756 (1982). Proof beyond a reasonable doubt is constitutionally required in criminal cases. *In re Winship*, 397 U.S. 358, 364 (1970). In addition, the Supreme Court has imposed a standard of "clear and convincing" proof in State civil proceedings for permanent termination of parents' custody of a child, *Santosky* v. *Kramer*, *supra* at 767-768, and for indefinite, involuntary commitment of an individual to a mental hospital, *Addington* v. *Texas*, 441 U.S. 418, 433 (1979). In each case, the State was required as a matter of Federal constitutional law to present stronger than ordinary proof that State statutory conditions had been fulfilled. The Court has also imposed, without specific reference to due process, standards of proof higher than a preponderance of evidence under certain Federal statutes. *Woodby* v. *Immigration & Naturalization Serv.*, 385 U.S. 276, 284-285 (1966) (deportation). *Chaunt* v. *United States*, 364 U.S. 350, 353 (1960) (denaturalization). *Schneiderman* v. *United States*, 320 U.S. 118, 125 (1943) (denaturalization).

Minimum due process varies with context. In *Mathews* v. *Eldridge*, 424 U.S. 319, 335 (1976), the Court identified three "distinct factors" that determine what procedures are necessary in particular cases affecting protected "liberty" or "property" interests. These are "[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

The first consideration — the individual rights that may be affected — is particularly important here because a standard of proof is itself a reflection, and a signal to the factfinder, of the significance of the rights at stake. See *Addington*

v. *Texas, supra* at 425; *In re Winship, supra* at 370 (Harlan, J., concurring). In *Santosky* v. *Kramer, supra* at 753, the State's custody proceeding put at issue a "fundamental liberty interest of natural parents in the care, custody, and management of their child." In *Addington* v. *Texas, supra*, the individual was threatened with loss of physical liberty.

A tenant's interest in her public housing tenancy, formalized in her lease as well as in the statutory requirement of "cause," is a protected interest, entitling her to fair procedures before the government can terminate it. See, e.g., *McQueen* v. *Druker*, 317 F. Supp. 1122, 1130 (D. Mass. 1970). See generally L. Tribe, American Constitutional Law 522-532 (1978).[15] A public housing tenancy is also of great personal importance to the tenant and her family, who may have nowhere else to turn. Nevertheless, housing is not within the small circle of interests recognized as "fundamental." Cf. *Lindsey* v. *Normet*, 405 U.S. 56, 73-74 (1972). The right to public housing derives from no deeper source than the State's undertaking to provide it. It may greatly affect the quality of life, but it is not as essential to human character as freedom from indefinite confinement, or the relationship between parent and child.[16]

The second measure of minimum procedure is the risk of error. Any increase in the housing authority's burden of proof will, of course, diminish the risk of erroneous deprivation of individual rights. Under any given standard, however, the risks of error are fewer in a summary process proceeding based on acts of violence than in commitment proceedings or proceedings to determine parental unfitness. The hous-

---

[15] We do not attempt to determine whether the tenants' interests are simply "property," as opposed to "liberty" interests, or whether such a distinction has any relevance to the degree of process due.

[16] The tenants would add to the balance their asserted interest in freedom from punishment for acts for which they were not personally responsible. Whatever the extent of this interest, however, it is not the right at stake in the proceedings, and adds no weight to the tenants' procedural claims. The relevant interest is the interest in continued tenancy in public housing projects.

ing authority, it is true, is likely to have superior resources for litigation, creating an imbalance between adversaries. The central issue to be determined, however, is a simple one of occurrence or nonoccurrence of objective facts.[17] The process of adjudication is not subject to the misleading influences present in *Santosky* v. *Kramer, supra* at 761-763 (imprecise standards, subjective questions, and vulnerability to class or cultural bias) and *Addington* v. *Texas, supra* at 426-427 (risk of precipitous commitment on basis of isolated idiosyncratic behavior).

The State, and housing authority tenants, have a strong interest in effective use of available measures to combat the terrifying incidence of violence in the housing projects. The State's specific interests in evicting tenants whose household members have participated in acts of violence and destruction within the projects have already been identified — prompt and effective removal of the wrongdoer from the housing project, and encouragement of tenants to monitor and restrain the conduct of household members. Eviction on the basis of an erroneous determination of the relevant facts will not, of course, promote these interests. See *Santosky* v. *Kramer, supra* at 765-766; *Addington* v. *Texas, supra* at 426. On the other hand the State's interests call for eviction whenever the facts warrant it. A stricter standard of proof would frustrate them by increasing the likelihood of error in the tenants' favor.

Applying the three *Mathews* v. *Eldridge* factors in the light of comparison with the situations in which the Supreme Court has required special degrees of proof in State proceedings, we conclude that due process does not demand a special standard of proof in proceedings to evict tenants from public housing on the basis of violent acts by household mem-

---

[17] The issue of the tenants' responsibility under G. L. c. 121B, § 32, also depends largely on objective facts. The fact that the wrongdoer was a household member raises the inference of awareness of problems and ability to prevent violent acts on the premises. Rebuttal will generally consist of the wrongdoer's age and prior record, or definite steps taken by the tenant to obtain help in avoiding violence.

bers. The tenants' interests are important, but not "fundamental." There is no unusual risk of error. Finally, the interests of the State and other tenants in realizing the safety benefits of eviction weigh against a standard that would alter in the tenants' favor the ordinary allocation of the risk of erroneous factfinding.

4. *Sufficiency of the Evidence of Violent Acts by Household Members.*

Each tenant contends that the evidence connecting her son to firebombings on housing project premises was insufficient under any standard of proof. We review the evidence briefly, and conclude that in each case the judge's finding that the tenant's son participated in violent acts was supported by at least a preponderance of evidence.

a. *Mark McDonough.* The BHA began eviction procedures against Mrs. Gormley on the ground that her son Mark McDonough had participated in a firebombing on BHA premises, and had assaulted a BHA employee on BHA premises.[18] At trial in the Housing Court, a resident of the firebombed apartment, who knew Mark, testified that she had seen Mark and two others running from the area immediately after the firebomb was thrown. No one else was in view. The witness's younger brother, who also knew Mark, testified that he had seen Mark near the building just before the incident, and again some time after the incident, and had heard Mark ask a firefighter what had happened. Mark, his mother, and a neighbor testified that Mark had been asleep at home at the time of the firebombing.

Mrs. Gormley contends that Mark's presence at the scene of the firebombing does not establish his involvement. She also contends that flight is insufficient to support a finding of participation in the act. The various evidence, however, must be viewed in combination, and so viewed, is sufficient.

---

[18] Mrs. Gormley does not contest the finding that Mark assaulted a BHA employee, which was based on the employee's testimony that Mark had taunted him with racial insults, threatened to kill him, and swung at his head with a large stick.

Presence immediately after the incident, the absence of others in the area, and suspicious conduct such as flight, provide a preponderance of evidence of involvement in the act. Cf. *Commonwealth* v. *Rhoades*, 379 Mass. 810, 812-816 (1980). *Commonwealth* v. *Sampson*, 7 Mass. App. Ct. 514, 517-518 (1979). The credibility of conflicting testimony was a matter to be determined by the judge.

b. *William Bunting.* The BHA's termination of Mrs. Bunting's lease was based on William Bunting's participation in a firebombing. The evidence implicating William was very similar to the evidence concerning Mark McDonough. A neighbor testified that she had seen William Bunting and George Foley (a friend), both of whom she knew, running from the scene of the firebombing immediately after it occurred. She saw no one else in the area. Shortly afterward, she saw William return to the building containing the firebombed apartment, out of breath, and enter an apartment belonging to George Foley's uncle. George Foley's cousin testified that George and William had been together that evening, thus corroborating one aspect of the neighbor's testimony. For the reasons given in our discussion of Mark McDonough, this evidence was sufficient to support a finding that William participated in the firebombing.

5. *Racial Motive.*

Bunting questions the judge's finding that William Bunting's firebombing of a neighboring apartment was racially motivated. The only evidence bearing on this issue was the victim's testimony that a man residing with her was part Micmac Indian. We need not consider whether this was a sufficient indication of racial motive, however, because the finding of motive was surplusage. A firebombing, whether or not motivated by racism, is an act of random and extremely dangerous violence. The presence of racial hostility may add to the urgency of the problem and the likelihood that more violence will ensue, but it is not necessary to justify prompt remedial action by the BHA.

6. *Conclusion.*

We conclude that the lease forms signed by both tenants, and the termination provisions of G. L. c. 121B, § 32, au-

thorize the BHA to terminate housing project tenancies on the basis of serious acts of violence, committed at the projects by members of the tenants' household. Although the BHA need not demonstrate that the tenant knew or had reason to know of the household member's propensity for violence, or that she could have controlled his conduct, the "cause" requirement of G. L. c. 121B, § 32, provides relief from termination when special circumstances indicate that the tenant could not have foreseen the misconduct or was unable to prevent it by any available means, including outside help. With this limitation, at least, termination based on a preponderance of evidence that a member of the tenant's household committed serious acts of violence on BHA premises is consistent with due process. In the present cases, the tenants identified no special circumstances to negate the inference of awareness and control, and the judge's findings with respect to violent acts were supported by sufficient evidence. Therefore, we affirm the judgment in each case.

*So ordered.*