Donna SKINNER, Plaintiff,

v.

BOSTON HOUSING AUTHORITY, et al., Defendants.

Civ. A. No. 88–624–Y.

United States District Court,
D. Massachusetts.

July 5, 1988.

Jon Laramore, Boston, Mass., for plaintiff.

Myles McDonough, Boston Housing Authority, Legal Dept., Patrick Costello, Asst. Corp. Counsel, Law Dept., Boston, Mass., for defendants.

MEMORANDUM OF DECISION

YOUNG, District Judge.

This case involves the pervasive societal ramifications—and the enormous unrecognized social costs—of the insidious, and thus far unstoppable, spread of illicit drugs. It comes before the Court on a statement of agreed facts which, in First Circuit and Massachusetts procedural parlance, amounts to a case stated, *see RCI Northeast Services Division v. Boston Edison Co.*, 822 F.2d 199, 201 (1st Cir.1987); *Frati v. Jannini*, 226 Mass. 430, 115 N.E. 746, 747 (1917), i.e., all the facts material to

a resolution of the dispute are agreed and it only remains to properly declare the law.

Accusing Donna Skinner ("Skinner") of permitting drug dealing to take place in and from her apartment in a federally-funded public housing project administered by the Boston Housing Authority ("Authority"), the Authority has commenced the administrative process which can lead to her eviction.[1] Vigorously disputing the underlying allegations, Skinner strikes preemptively in this Court, claiming that in processing her case (and generally) the Authority has violated applicable federal regulations in various ways, thus infringing her civil rights. She seeks declaratory and injunctive relief and damages pursuant to the federal and state civil rights acts. 42 U.S.C. sec. 1983, Mass.Gen.Laws ch. 12, sec. 11I.

The agreement concerning the material facts obviates the need for rehearsing them here. Likewise, a variety of preliminary questions may be dealt with summarily.

■ First, the Court ought not abstain in the circumstances of this case. Despite the traditionally local nature of landlord-tenant disputes and the predominant role of the state judiciaries in their resolution, this case presents for decision a discrete question involving the interpretation of federal law and regulations. There are no parallel state proceedings pending, *see Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 431–432, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982) (holding that ongoing proceedings are one of the criteria that must be satisfied for abstention pursuant to the doctrine of *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed. 2d 669 [1971] ), although the Authority contemplates resort to the courts of the Commonwealth should that be necessary to accomplish Skinner's eviction. The decision here will do no more than bind the parties

with judicial application of the appropriate federal law; no interference with the state judiciary will result. *See Middlesex County*, 457 U.S. at 432, 102 S.Ct. at 2521 (noting the "strong federal policy against federal court interference with pending state judicial proceedings absent extraordinary circumstances"). Finally, the jurisdiction of this Court is properly invoked by a plaintiff with the requisite standing. *Samuels v. District of Columbia*, 770 F.2d 184, 199 (D.C.Cir.1985) ("[T]he plaintiffs clearly allege that the . . . public housing officials have violated the applicable HUD regulations, and that allegation alone, we think, states a cognizable section 1983 claim"). In such circumstances, this Court would fail of its duty were it not to decide the cause. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976) ("[a]bstention from the exercise of federal jurisdiction is the exception not the rule"); *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188–189, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959) ("Abdication of the obligation to decide cases can be justified under [the abstention] doctrine only in . . . exceptional circumstances"). *See Cuesnongle v. Ramos*, 835 F.2d 1486, 1499 (1st Cir.1987).

Second, it cannot be reasonably argued that federal preemption does not apply in these precincts. Landlord-tenant relations in federally funded housing projects are a matter of extensive, parallel regulation by both federal and state authorities. Should those regulations conflict it is clear beyond peradventure that, under the Supremacy Clause of the United States Constitution, the federal statutory and regulatory scheme must prevail. *See, e.g., Champion Int'l Corp. v. Brown*, 731 F.2d 1406, 1408 (9th Cir.1984).

At the nub of this controversy is the issue whether the Authority can "waive"

---

**1.** The excruciatingly difficult balance of interests which can lead a public landlord to terminate a lease on such grounds are thoughtfully discussed and explicated in *Spence v. Reeder*, 382 Mass. 398, 416 N.E.2d 914 (1981). *See Spence v. Gormley*, 387 Mass. 258, 439 N.E.2d 741 (1982); *Hodess v. Bonefont*, 401 Mass. 693, 519 N.E.2d 258 (1988). Each year the Authority processes hundreds of "cause" evictions, most

involving allegations concerning drugs. It follows that the greater the level of administrative due process the Authority affords, the higher are its transaction costs and the longer may a tenant delay eviction to the possible detriment of neighboring tenants. On the other hand, for the tenant, next to a loss of liberty itself, the stakes—affordable housing for one's self and family—could hardly be higher.

the extensive grievance procedures found in the applicable federal regulations and thus move to evict Skinner expeditiously.[2] There is no doubt that the power to waive the grievance procedures is expressly conferred on the Authority by state statute, Mass.Gen.Laws ch. 121B, sec. 32 par. 6, and federal regulation, 24 C.F.R. sec. 966.-51(a) ("the waiver regulation").

A close examination of the statutory and regulatory framework, however, reveals that the waiver regulation is at the heart of a classic tug of war between Congress and the President. The full background is limned in *Samuels v. District of Columbia,* 770 F.2d 184, 188–191 (D.C.Cir.1985) and need only be paraphrased here.

During the 1970's, the Department of Housing and Urban Development promulgated various regulations to govern the landlord-tenant relationship in federally funded housing projects.

The grievance procedure mandated by these regulations includes an informal settlement conference, [24 C.F.R.] sec. 966.54, and, failing settlement, a relatively formal proceeding before an impartial hearing officer with rights to notice, limited discovery, representation by counsel, and an administrative appeal, *see id.* secs. 966.55—966.58.

*Samuels* at 189. The waiver regulation was promulgated in 1975 as part of a larger, complex regulatory scheme governing tenant grievances. *See* 40 Fed.Reg. 33406, August 7, 1975.[3] What the regulations appear to envision is an elaborate process of alternative dispute resolution "designed to avoid costly and devisive public housing litigation by channeling tenant-management disputes into a decentralized, informal, and relatively non-adversarial administrative process." *Samuels* at 189 (*citing Brown v. Housing Auth.,* 471 F.2d 63, 66–67 [7th Cir.1972] and *Glover v. Housing Auth.,* 444 F.2d 158, 161–162 [5th Cir.1971] as examples of this view of the regulations).[4]

---

**2.** Skinner also argues that, upon the statement of agreed facts, the "notice" she was given relative to her eviction was inadequate. This Court rules to the contrary, concluding that the notice of grounds for her eviction given her after her conference with the project manager was fully adequate to apprise her of the basis for the action of the Authority and the year's delay in serving the notice to quit does not vitiate the adequacy of the initial notice where, in the circumstances of this case, there is no suggestion that the Authority ever backed away from or modified its original determination. *See* the well-reasoned and persuasive opinion of the Massachusetts Appeals Court in *Spence v. O'Brien,* 15 Mass.App.Ct. 489, 498, 446 N.E.2d 1070, 1076 (1983).

**3.** The waiver regulation, 24 C.F.R. sec. 966.-51(a), governs public housing agencies ("PHAs") and provides:

(a) The PHA grievance procedure shall be applicable to all individual grievances as defined in sec. 966.53 of this subpart between the tenant and the PHA: *Provided,* That in those jurisdictions which require that, prior to eviction, a tenant be given a hearing in court containing the elements of due process, as defined in sec. 966.53(c), the PHA may exclude from its procedure any grievance concerning an eviction or termination of tenancy based upon a tenant's creation or maintenance of a threat to the health or safety of other tenants or PHA employees.

As defined in 24 C.F.R. sec. 966.53(c), the "elements of due process" are:

(c) "Elements of due process" shall mean an eviction action or a termination of tenancy in a State or local court in which the following procedural safeguards are required:

(1) Adequate notice to the tenant of the grounds for terminating the tenancy and for eviction;

(2) Opportunity for the tenant to examine all relevant documents, records and regulations of the PHA prior to the trial for the purpose of preparing a defense;

(3) Right of the tenant to be represented by counsel;

(4) Opportunity for the tenant to refute the evidence presented by the PHA including the right to confront and cross-examine witnesses and to present any affirmative legal or equitable defense which the tenant may have;

(5) A decision on the merits.

**4.** In actual practice, the operation of the tenant grievance procedures seems to have fallen far short of the glowing regulatory ideal. Existing outside the Massachusetts Court system, the formalized procedural safeguards found in the regulations are, in practice, bereft of the certainty and consistency provided by an independent judiciary armed with the doctrines of stare decisis and res judicata. In short, the regulations provide a formalized procedure without an adequate means for ascertaining and uniformly applying a complex body of governing law.

The *Samuels* court goes on to recount the next important developments:

In 1982, the current administration proposed a far-ranging revision of all federal regulations governing the responsibilities of local PHAs under the Act. *See* 47 Fed.Reg. 55,689 (1982). *In particular, the 1982 rulemaking proposed to limit the grievance procedure requirement to disputes concerning rent calculation and tenant selection and to eliminate any federal requirement that PHAs provide an administrative forum for tenant complaints concerning PHA lease obligations.* See id. at 55,692 ("Under the proposed rule, the PHA would not be required to make available an administrative hearing procedure for miscellaneous disputes between the PHA and its tenants arising in day-to-day operation of the housing project.").

*In response to this proposal, Congress specifically amended the Act to require PHAs to establish and maintain an administrative grievance procedure for the resolution of all tenant disputes concerning adverse PHA action.*

.    .    .    .    .

Housing and Urban–Rural Recovery Act of 1983, sec. 204, Pub.L. No. 98–181, 97 Stat. 1153, 1178 (codified at 42 U.S.C. sec. 1437d(k)). Congress contemplated that HUD would implement this provision by retaining its present grievance procedure regulations. *See* H.R.Rep. No. 123, 98th Cong., 1st Sess. 35–36 (1983).

*Samuels* at 190. (emphasis added)

The language employed by Congress leaves no doubt as to its intent. Tenant grievance procedures are now formalized by statute. So is the path by which those procedures may be waived:

An agency may exclude from its procedure any grievance concerning an eviction or termination of tenancy in any jurisdiction which requires that, prior to eviction, a tenant be given a hearing in court which the Secretary [of HUD] determines provides the basic elements of due process.

42 U.S.C. sec. 1437d(k).

The statutory waiver provision, 42 U.S.C. sec. 1437d(k), differs from the earlier regulatory provision, 24 C.F.R. sec. 966.51(a), in two important respects. First, the waiver regulation applies only in cases where the eviction or termination is based upon a tenant's creation or maintenance of a threat to the health or safety of other tenants or public housing agency employees. The statutory waiver provision has no such limitation. Second, and more important here, unlike the waiver regulation which simply defines the elements of due process and leaves it to the Authority to determine whether the local courts provide such safeguards, the statutory waiver pro-

---

Procedure without substance is a recipe for delay and division. It is therefore no wonder that the Authority here—experiencing delays of over a year in merely issuing a notice to quit—has increasingly and routinely sought to bypass the regulations and send matters of eviction directly to the courts where they are headed in any event. "[P]rocedural requirements entail the expenditure of limited resources,.... At some point the benefit to individuals from an additional safeguard is substantially outweighed by the cost of providing such protection...." H. Friendly, *Some Kind of Hearing,* 123 U.Pa.L. Rev. at 1276. As the First Circuit has observed, "[I]t is no exaggeration to state that the undue judicialization of an administrative hearing ... may result in an improper allocation of resources, and prove counter-productive." *Gorman v. University of Rhode Island,* 837 F.2d 7, 15 (1st Cir.1988).

These problems are endemic to alternative dispute resolution mechanisms imposed on people who have important rights at stake. Perceived as a form of "second-class justice," these pseudo-courts have significant institutional shortcomings. *See* H. Edwards, *Alternative Dispute Resolution: Panacea or Anathema?,* 99 Harv.L.Rev. 668, 676–679 (1986). Increased judicialization may remedy these but, as the pseudo-courts come more to resemble the genuine article they were designed to replace, their own costs increase and they drain limited resources from the public court system itself. Perhaps it is more than coincidence that Massachusetts has now fallen to dead last among the fifty states in the provision of judicial services to its citizens. It appears that, despite the incessant criticism, where important rights are at stake our people still demand an adversary system of justice with an independent judiciary and a chance to lay one's case before the jury of one's peers.

vision shifts this determination to the Secretary of HUD.

This much is relatively clear. What is totally inexplicable to this Court is the fact that, in the five years since the enactment of the statutory waiver provision, the Secretary has not determined that a single state court system provides the basic elements of due process in landlord-tenant disputes.[5]

The Secretary's sloth precipitates the central issue in the present dispute. Skinner's argument is straightforward. Since the waiver regulation conflicts with the later statutory enactment, she contends that the waiver regulation must necessarily be supplanted by the statutory mandate. Moreover, because at present a precondition for waiver is the certification of the Secretary and because he has not gotten around to certifying that Massachusetts courts provide the basic elements of due process to tenant, she is entitled to the full administrative grievance procedure prior to eviction, the Secretary's inaction having deprived the Authority of the power to waive the regulations.

The Authority makes two arguments in an effort to save the waiver regulation. First, it asserts that, because Congress contemplated the continuance of the existing regulations, H.R.Rep. No. 123, 98th Cong., 1st Sess. 35–36 (1983), the waiver regulation ought stand until the Secretary acts. This is a sensible construction, it argues, as it avoids any lacunae in the waiver provisions and thus avoids the administrative nightmare which, it is argued, will ensue if all tenants facing eviction must be afforded full administrative hearings prior to resort to the courts. Second, the Authority points out that the goal of both the waiver regulation and the statutory waiver provision is identical, i.e., ensuring that a tenant will be afforded the basic elements of due process prior to eviction; that there is here no dispute but that Massachusetts courts actually afford far more than the basic elements of due process to all litigants including tenants; and that this Court ought recognize these undisputed facts, pursuant to Fed.R.Evid. 201, by dismissing this action.

■ Though sensible as a practical matter, both these arguments founder on the unambiguous language which the Congress has here chosen to employ. Here, as in *Martinez v. Rhode Island Housing & Mortgage Finance Corp.*, 738 F.2d 21, 26 (1st Cir.1984), the statutorily-required means of effectuating compliance with due process concerns is "totally at odds" with the earlier waiver regulation. The regulation must therefore yield.[6] Congress has selected the Secretary of HUD—not the Authority or this Court—as the appropriate entity to certify that local landlord-tenant court procedures comply with the essential elements of due process. This is not a hard job. One imagines that a competent lawyer with access to a good law library and guided by the definitions already promulgated in 24 C.F.R. sec. 966.53(c) could have accomplished it in two weeks, perhaps faster.[7]

---

5. This would be a remarkable circumstance indeed were one to infer that the Secretary was busy scurrying about, flunking the several state judiciaries for failing to provide the basic elements of due process. The reality is much more prosaic. The Secretary simply appears to have done nothing at all under Section 1437d(k), one way or the other. It is this inactivity which is remarkable, especially in view of his draft regulations which recognize his pivotal role in implementing the statutory waiver provision. *See* Proposed 966 C.F.R., Subpart E, published at 51 Fed.Reg. 26504, 26520 (July 23, 1986).

6. I do not come to this conclusion lightly and recognize that my friend and former colleague, the distinguished Chief Justice of the Massachusetts Housing Court, an expert in landlord-ten-

ant law, has recently faced this same issue and concluded that the waiver regulation survives. *See Boston Housing Auth. v. Toledo*, Summary Process No. 46575, Order of April 27, 1988 (Housing Ct. of the City of Boston) (Daher, C.J.). On this point of federal law, however, I respectfully conclude that the better reasoning leads to the conclusion that the regulation is repugnant to the statute.

7. This is not to say that the law of the several states is free from the glitches which only a long-term familiarity with local court practice would identify. For example, in Massachusetts it may well be that the so-called Uniform Rules Governing Summary Process do not, in fact, have any force and effect in the Massachusetts Superior Court. This is because those rules are

■ The President signed the Housing and Urban–Rural Recovery Act of 1983 and the bill, therefore, became law on November 30, 1984.[8] *See* 97 Stat. 1153, 1307 (1983). More than five years have now elapsed. The simple fact is that the Secretary is not, in this respect, doing the job Congress assigned him. He is not taking care that the laws be faithfully executed. It ill serves our constitutional form of government, with its careful separation of powers, for this Court to ignore its duty and misconstrue the law because the Secretary is ignoring his executive responsibility. Rather, it is for this Court to unequivocally declare what Congress so directly mandated in 42 U.S.C. sec. 1437d(k)—there can be no waiver of the statutorily required tenants' administrative grievance procedures unless and until the Secretary certifies that the courts of Massachusetts provide tenants with the essential elements of due process.[9]

There is no occasion for an injunction here, the Court presuming that the Authority will faithfully execute the law as this Court has declared it.

purportedly promulgated under the authority of the Massachusetts Chief Administrative Justice with the approval of the Massachusetts Supreme Judicial Court. The Chief Administrative Justice has no rulemaking authority with respect to the Massachusetts Superior Court. Only the justices of that court, with the approval of the Supreme Judicial Court, have that authority. *Compare* Mass.Gen.Laws ch. 211B, sec. 9 (no rulemaking power enumerated among the responsibilities of the Chief Administrative Justice) *with* Mass.Gen.Laws ch. 213, sec. 3 (justices of the Superior Court empowered to promulgate rules subject to the approval of the Supreme Judicial Court). It is perhaps for that reason that all subsequent Massachusetts uniform rules recommended by the Chief Administrative Justice have actually been promulgated under the undoubted superintendence power of the Massachusetts Supreme Judicial Court. Whatever the force of this example, the minimal standards of due process found in 24 C.F.R. sec. 966.53(c) are certainly present in Massachusetts, a fact which can be readily confirmed by reference to the General Laws of Massachusetts and the rules of civil procedure applicable in its several courts.

**8.** A bill becomes law on the date of the President's approval of it, in the absence of any express effective date. *See Gardner v. The Collector*, 6 Wall. 499, 504, 18 L.Ed. 890 (1867).

Likewise, no damage award will be granted for two reasons. First, while the Court infers that the waiver of administrative hearing sought to be imposed on Skinner here was, in fact, a policy of the Authority itself, *see City of St. Louis v. Praprotnik*, —— U.S. ——, 108 S.Ct. 915, 923, 99 L.Ed.2d 107 (1988), the Authority is immune to a damage claim here since it acted pursuant to a regulation not expressly repealed, 24 C.F.R. sec. 966.51(a), and without adequate reason to know that its conduct contravened Skinner's civil rights.[10] *See Harlow v. Fitzgerald*, 457 U.S. 800, 818–19, 102 S.Ct. 2727, 2738–39, 73 L.Ed.2d 396 (1982). Second, no damages are awarded Skinner because, as yet, she has suffered no actual injury, and punitive damages are not warranted for this transgression.

■ From the undisputed facts before the Court, it is likewise clear that the Authority has violated Skinner's rights under the Massachusetts Civil Rights Act, Mass. Gen.Laws ch. 12, sec 11I, since the notice to quit served on her was a form of coer-

**9.** As a practical matter, the Court recognizes that this ruling will impose a burden on the Authority to provide Skinner (and others) with administrative hearings that will be entirely duplicated in Court at a later date. The attendant delay has the potential of increasing the risk to other public housing tenants. If the Authority considers the result unsatisfactory, while it may of course appeal, its practical remedy lies in a reinvigorated political process, not in litigation pressing for a skewed legal analysis. The Secretary's dereliction of duty ought be the focus of immediate remonstrance by the Mayor of Boston as Receiver of the Authority and by those in Congress who care about public housing. More fundamental, concerned citizens will wish to consider whether this federalization of the authority to certify the preconditions of waiver is in the public interest. These are political matters about which the Court expresses no opinion beyond noting that the appropriate resolution of these social policies properly devolves the legislative and executive branches. The Court's function in the premises is but to teach the law as enacted.

**10.** Compare the discussion above with the contrary ruling in *Boston Housing Auth. v. Toledo*, Summary Process No. 46575, Order of April 27, 1988 (Housing Ct. of the City of Boston) (Daher, C.J.).

cion to which this Court has ruled the Authority has no present right to resort. The Massachusetts Civil Rights Act is an extraordinarily broad remedy.[11] As yet, Massachusetts courts have not limited it by any doctrine of qualified immunity, by abrogating the concept of *respondeat superior*, or by granting immunity for good faith resort to legal processes. *But see Chicopee Lions Club v. District Attorney for the Hampden District*, 396 Mass. 244, 251, 485 N.E.2d 673 (1985) (scope of prosecutorial immunity under Mass.Gen.Laws ch. 12, sec. 11I is at least as broad as under Section 1983). Even so, the finding that Skinner has suffered no actual damage is sufficient to dispose of the claim under the Massachusetts Civil Rights Act.

Upon this reasoning, the Court entered judgment declaring the waiver regulation invalid, but refused to enter an injunction or order the award of damages.

**11.** To understand just how sweeping a remedy is here involved, compare the present writer's opinion as an Associate Justice of the Massachusetts Superior Court in *Bell v. Mazza*, No. 139356 (Mass.Superior Court, June 6, 1984) (Young, J.) with the reversal thereof by the Massachusetts Supreme Judicial Court in *Bell v. Mazza*, 394 Mass. 176, 474 N.E.2d 1111 (1985). *See* N. Shilepsky & R. Ward, The Massachusetts Civil Rights Act and Private Employment Litigation, *Third Annual New England Employee Relations Conference* (MCLE, 1988) 91–94. *See also* S. Leibowitz, R. Sherman & J. McLindon, The Project to Combat Racial Violence: A Six-year Retrospective, 32 Boston Bar Journal 33, notes 1, 8–11 (1988).

The recent decision in *Pheasant Ridge Assoc. Limited Partnership v. Burlington*, 399 Mass. 771, 780–782, 506 N.E.2d 1152 (1987) may signal that the limits of the sweep of the Massachusetts Civil Rights Act have been met. Indeed, it can be argued that *Pheasant Ridge*, which held that the threat to use lawful means to block a land development resulting in an invalid land taking "does not interfere or attempt to interfere with the landowner's rights in the land by coercion," controls here, as the Authority did no more than rely in good faith on an invalid regulation to move directly to evict Skiller. Section 11I of Mass.Gen.Laws ch. 12, however, prohibits interference by coercion with rights, including property rights, secured by the Constitution of the Commonwealth. If *Pheasant Ridge* means that good faith invocation of invalid laws and regulations in order to coerce a person out of her home or off her land is not actionable under the Massachusetts Civil Rights Act, then a major and heretofore unrecognized defense to such actions has been erected. In view of the absence of harm in this case, however, this Court need not resolve the reach of the *Pheasant Ridge* decision.