**First Trust and Savings Bank, Trustee under the Will of Dwight F. Cameron, Appellant, v. John Raklios, Appellee.**

### Gen. No. 31,775.

1. LANDLORD AND TENANT—*lessee's covenants running with the land.* Covenants in a lease that the lessee will not permit the premises to be used for an illegal purpose, and that he will sublet only to a reputable subtenant, run with the land and are binding upon the subtenant.

2. LANDLORD AND TENANT—*when possession by Federal officers is possession of tenant.* Possession of leased premises by Federal officers by reason of the operation of an illicit still by the subtenant was the possession of the tenant, so far as his obligation to pay rent to the landlord is concerned.

3. LANDLORD AND TENANT—*when failure of landlord to repair after fire is excused.* Failure of a landlord to make repairs within the time specified in the lease, after the premises becoming untenantable by fire cannot be successfully set up by the tenant to a suit upon the lease for rent, where the tenant covenanted not to permit the premises to be used for an illegal purpose and that he would sublet only to a reputable subtenant, and the landlord is prevented from making repairs by the possession of the premises by Federal officers by reason of the operation of an illicit still by the subtenant, although the tenant did not know of the illicit operation.

Appeal by plaintiff from the Municipal Court of Chicago; the Hon. CHARLES F. MCKINLEY, Judge, presiding. Heard in the third division of this court for the first district at the March term, 1927. Reversed and remanded with directions. Opinion filed January 18, 1928.

PACKARD, PECKHAM & BARNES, for appellant.

ROSE & SYMMES, for appellee.

MR. PRESIDING JUSTICE TAYLOR delivered the opinion of the court.

On June 22, 1926, the First Trust and Savings Bank, trustee under the will of Dwight F. Cameron, deceased, as plaintiff, filed in the municipal court a statement of claim and a *cognovit,* based on a written lease of certain premises on Michigan avenue, and, on June 23, 1926, obtained a judgment against John Raklios, the defendant, in the sum of $1,062.24, for rent for the months of April, May and June, 1926, at $350 per month, together with interest and costs.

Pursuant to a motion and leave given by the court, the defendant, on July 23, filed a petition asking that the judgment be vacated. The petition alleged, substantially, that the lease, which was dated March 13, 1924, provided that if the premises should be rendered untenantable by fire or other casualty, the lessor may, at his option, terminate this lease, or repair said premises within thirty days, and failing so to do, or upon the destruction of said premises by fire, the term

hereby created shall cease and determine; that at a period of time more than thirty days prior to the first day of April, A. D. 1926, the said premises were rendered untenantable by fire and other casualty, and that the lessor in the said lease, the plaintiff in the said cause, has not repaired the said premises since they were so rendered untenantable as aforesaid, and that they have continuously since that time, and now are, untenantable; and that as a result thereof the term created by said lease ceased and determined prior to the said month of April; and that on the first day of the said month of April the said term was not in existence, and never since that time has been, and is not now; that when the term ceased and terminated, as aforesaid, the lease became and was and continued to be of no effect and that the plaintiff had no power under it to confess judgment.

On August 5, 1926, an order was entered giving the defendant leave to make a defense and ordering a trial, and that the judgment stand as security until the further order of the court; also, providing that the petition, above set forth, stand as an affidavit of merits.

There was a trial before the court, without a jury, and on January 8, 1927, an order was entered vacating and setting aside the judgment by confession of June 23, 1926, and giving judgment for the defendant for costs. This appeal is by the plaintiff from that judgment.

Inasmuch as the record contains over 1,000 pages, it is not reasonably practicable to state here more than the salient facts.

On March 13, 1924, the plaintiff leased, in writing, to the defendant, for restaurant purposes only, the premises known as 2337–2339 S. Michigan avenue, Chicago, in what is commonly called "Automobile Row," from May 1, 1924, until April 30, 1929, for $20,700, payable in monthly instalments of $350. The premises were vacant from January 29, 1925, to the end of January,

1926. The defendant himself never occupied the premises, either for a restaurant, or any other purpose.

The lease contained the following provision:

"In case said premises shall be rendered untenantable by fire or other casualty, the lessor may, at his option, terminate this lease, or repair said premises within thirty days, and failing so to do, or upon the destruction of said premises by fire, the term hereby created shall cease and determine."

The lease also provided that the lessee would not permit said premises "to be used for any unlawful purpose or purposes that will injure the reputation of the same, or of the building of which they are a part."

On the subject of subletting, the lease provided as follows:

"The lessee shall have the right to sublet the demised premises to persons or concerns engaged in any reputable business including those engaged in the automobile business and kindred lines. If he attempts to sublet the premises he shall first attempt to secure a subtenant engaged in a business other than the automobile business. Failing in this he may then attempt to secure a subtenant engaged in the automobile or kindred business."

On February 1, 1926, the defendant sublet the premises, in writing, to one Morris Blum for radio purposes only, Blum's term to expire concurrently with that of the original lease. Blum's rent, according to the defendant, was $350 a month. A sign, "Michigan Radio Co." was put on the building.

The premises in question consisted of a lot 25 by 170 feet, and a three-story building, which was originally an English basement residence. Prior to the time of the original lease, the building had been reconstructed to meet the requirements of, so-called, Automobile Row. After the premises were sublet to Blum, he put a radio display in the window, consisting of three cabinets.

On March 26, 1926, a fire occurred on the premises, and, on March 27, pursuant to a search warrant, the premises were entered and custodians, appointed by the United States marshal, placed in charge, and, pursuant to the warrant, the United States marshal seized, upon the premises, the following:

1 500 gal. Still and all its attachments.
1 Upright Steam Boiler.
1 Chicago Truck.
1 Ford Truck.
1 Drum of Alco.
30 5 gal. cans Alco.
30 150 gal. Tanks.

The floor of the building was partitioned into four different spaces, the first was about 25 feet, separated from the second by a wooden partition, running to the ceiling; the second was about 40 feet deep, and separated from the third by a second wooden partition of a temporary character. Beyond that was a space of about 15 feet, which was separated from the fourth space by a plaster partition, with double sliding doors. Beyond that was the rear part, which opened out through a sliding door at the east end into the alley. A large freight hand elevator led from the main floor to the second story. Both the second and the third floors were neglected and dilapidated. The two delivery trucks that were taken under the search warrant were in the rear compartment on the first floor.

The evidence of Stanley, a government inspector, who took possession of the premises on March 26, under instructions from the United States marshal, and who remained as custodian from that time until June 2, is to the following effect: That in the first space there was a showroom with some radio apparatus—three cabinets; that there was nothing else there in the way of radio apparatus; that they were in the window; that the showroom, back to where the first wooden partition was, was in fairly good condi-

tion, with no signs of fire; that the first partition was down; that in the second space, where the distillery was, there was a hole in the ceiling 15 feet across that had been burned through; that "There were appliances in there for the making of alcohol," "a 75-gallon copper kettle, which was part of the still to which the heat was applied"; that in one corner of the space, there was a storage tank of 50-gallons capacity, and in another part of the space, a condenser, with a copper coil inside; that the whole apparatus constituted a "still"; that there was alcohol on the premises, some in the pipes of the still; that the still was all connected up, and had been damaged only slightly; that in the third space there was no fire damage; that the furnace was back of what has been described as the stillroom in the basement; that in the same room there was a steam boiler.

Saturday morning, the day after the fire, one Vroo-man, the plaintiff's outside renting man, went to the premises, met a number of officers there, and was told that he could not go through the building, that it was in the hands of the Prohibition Department, and referred him to a man named Donohue, of the Prohibition Enforcing Office in the Transportation Building. He went to see Donohue, and told him that he desired to make arrangements to have the necessary repairs and alterations made, and Donohue said, "It is in our hands now, and we are not out, and the marshal is going to take possession." Vrooman testified that the marshal's office granted him the privilege of putting in the plate glass, and making certain other repairs that they could make at that time; that later, he talked with a custodian on the premises, and told him that they were trying to make arrangements to start their repairs; that the custodian said they could not do anything without an order from the marshal.

On March 27, custodians were appointed by the United States marshal, and placed in charge. They

received instructions to lock the doors, and undertook to keep the evidence on the premises intact. Oros, a United States marshal, testified that he took possession in the name of the government, and that there were two sets of two custodians, each with a 12-hour shift.

On April 28, 1926, a libel for the condemnation of the distillery apparatus and the alcohol on the premises was filed, which alleged that alcohol was being distilled, without taxes, in violation of the Revenue Law. The next day a monition was issued, which commanded the marshal to attach the articles described, and to detain them in his custody until the further order of the court. The marshal made return that he had attached the articles described and had them in his custody, and stored on the premises in question. A judgment of condemnation, forfeiture, destruction and sale was entered on June 16, 1926; and an order approving the sale was entered on July 3, 1926. The last custodian was not withdrawn until July 10, 1926.

Immediately after the fire, the landlord's agent, Read, went to the premises and was refused admission unless he got authority from the marshal's office. The next day he obtained a letter from the marshal authorizing the custodian to permit him, Read, to enter "the building to make inspection for insurance companies interested in policies, and for no other purpose." That letter was signed on behalf of the United States marshal. The letter was presented and used, and inspection made as to immediate necessary repairs. Permission was then given by the marshal's office as follows: "Further permit is given to repair skylights, doors and windows, if done under supervision of custodians." That work, to protect the premises against the weather, was done by Read's men about April 16, and completed in about four or five days. The emergency repairs, making the building weather proof, were finished about April 21. The evidence of Read is that

he saw Mr. Pinkerton of the Government Office, and asked him whether he could get in to make repairs on the building; that Pinkerton told him he could not tell for several days whether they were going to take their men off or not; that the first of July was the last time he was at Pinkerton's office; that on July 15, Pinkerton, a deputy marshal, told them that they were through, and that it was all right for them to go ahead with the work; that they then began work, and on August 12, 1926, the work of repairing was completed.

At the close of the trial, the learned trial judge made certain findings of fact, among them the following:

(a) That the only legitimate use that was being made of the premises at the time of the fire was confined to the space between the front of the premises and the first wooden partition, and there was no damage by fire to that portion of the premises;

(b) That there was an illicit still being operated on the premises at the time of the fire, and for that reason the premises containing the illegal apparatus were taken possession of by the United States marshal and his custodians from March 27, 1926, the day after the fire, and retained up to July 10, 1926, continuously; that he denied admission to the representatives of the landlord for the purpose of making repairs during all of that period, and that the denial of entrance to the landlord, by the officers of the law, was the sole reason why the repairs were not made within 30 days following the fire, and that as soon as the landlord was given permission he entered and made the necessary repairs within 30 days thereafter;

(c) That after the fire the subtenant of the premises made no attempt to continue the sale of radio supplies which was the only apparently legitimate portion of his business, but disappeared, although there is no reason why he might not have continued with this radio business so far as the damage to the building from any fire was concerned.

The trial judge found as a matter of law:

(a) That the covenant binding the tenant not to permit the premises to be used for an unlawful purpose was a covenant running with the land; that the defendant was bound by the action of his subtenant in that regard, irrespective of whether he knew of such unlawful use or not.

(b) That a judgment in a libel proceeding, under the Revenue and Prohibition Laws of the United States for the sale of property on the ground that it constituted an illicit still, is a judgment *in rem*, binding upon all the world, and fixes the status of such property.

(c) That the covenant that the defendant shall have the right to sublease the premises to any person engaged in any reputable business, did not permit a leasing to one who constructs or conducts an illicit still therein, whether the defendant was aware of such use or not.

(d) That the declarations and conversations between the United States marshal, or his representatives, and the representatives of the plaintiff, both oral and written, during the period that the premises were in the custody of the law, are admissible as tending to establish the reason why the repairs were not made in 30 days, which is an essential part of the plaintiff's contention.

A special interrogatory, "Were the premises leased by the plaintiff to the defendant by the lease in evidence in this case rendered untenantable by fire or other casualty on March 26, 1926?" was submitted to the court, and was answered in the affirmative; and a special interrogatory, "Were the said premises by the plaintiff repaired within thirty days after they were rendered untenantable?" was answered in the negative, but with the qualification that they were rendered tenantable within 30 days after the plaintiff was permitted by the United States marshal to enter and make the necessary repairs.

The court, however, refused to hold as a proposition of law that the seizure and holding of the premises by the United States marshal, and his refusing to allow the plaintiff to make the necessary repairs on the inside of the building, were the direct and natural consequences of the acts of the subtenant, and that the defendant was not in a position to insist that the plaintiff must have litigated the legality of the marshal's holding the premises, and the plaintiff was under no duty to have litigated that question as a prerequisite to his claiming an extension of his time to repair on account of the marshal's holding.

It is the theory of the plaintiff that the defendant, being responsible for the presence of the United States marshal, was the sole cause of the landlord's failure to repair within 30 days, and the premises being restored within 30 days after the marshal withdrew, the plaintiff was entitled to the judgment which he obtained by confession, and that the trial judge erred in setting it aside.

On the other hand, it is the theory of the defendant that he sublet the premises for radio purposes to Blum, and had the right to do so; that he never covenanted to prevent the premises from being used for an unlawful purpose; that he simply covenanted that he would not permit them to be used, and if he had no knowledge that they were so used, he was not chargeable with having permitted them to be so used; and that he was not responsible for the presence of the United States marshal on the premises.

In the view we take of it, the chief question in the case upon this appeal is whether the possession of the premises by the officers of the Federal Government, by reason of the search warrant and libel, as the result of the violation of the law by the defendant and his subtenant, can successfully be set up and maintained by the defendant as a defense to a suit upon the lease for rent; in other words, to put the case bluntly, may

the defendant profit by, what seems to be, his own wrong?

As to the responsibility of the defendant for the acts of his subtenant: It is urged for the defendant that by the lease he did not covenant to prevent the premises from being used for an unlawful purpose; that "he simply covenanted that he would not permit them to be so used," and that "not knowing, he could not permit." That, in our judgment, considering the facts in this case, is unsound. The defendant was bound by a clause of the lease which ran with the land and was binding upon the subtenant to the effect that the premises should not be sublet to other than a reputable tenant, and should not be used for any unlawful purpose; yet, in violation of that obligation, he sublet the premises to one who, according to the evidence, pretended to run a radio business on the premises, while, in fact, that pretense was merely a cover for the operation of an illicit still. What the contents of the sublease were is not shown, but even without that, there is no doubt that the covenant in the original lease against the illegal use of the premises ran with the land and was binding upon the subtenant. In *Miller v. Prescott,* 163 Mass. 12, 39 N. E. 409, where the word "suffer" was being considered, the court said: "It may not be reasonable to hold that the covenant makes the lessee liable for an unlawful use of the property by trespassers, but he may well be held to 'suffer' unlawful use of the property if he does not take effectual measures to prevent such a use by those who occupy by his authority."

And in *Lubliner v. Gaston,* 243 Ill. App. 627 (not reported in full), this court said, considering the words, "will not permit said premises to be used for any unlawful purpose," "It is the law that if the terms of a lease between the plaintiff and the defendant are violated by the defendant's sub-tenants, the defendant is responsible therefor, whether or not he knew of such

violation. *Wheeler v. Earle,* 59 Mass. 31. In the latter case, the court said, 'By creating sub-tenants, the original lessee puts them in possession of the premises, and being thus in under him, their acts, if in violation of the condition of the lease, will cause a forfeiture.' *Burke v. Bryant,* 128 Atl. 821.''

It is urged for the defendant, however, that even though he were held responsible for the acts of his subtenant, the plaintiff was not prevented from making repairs by any governmental body, or by the act of the defendant, and that, consequently, the lease terminated 30 days after the time when he, the defendant, claims the premises were rendered untenantable by the fire. The trial judge found, and we think the evidence supports his finding, that, as far as the subtenant's use of the premises was concerned, they were not rendered untenantable by the fire, and as to the inhibition of entry by the act of the defendant, as we have already intimated, it was his conduct, through his subtenant, for whom he was responsible, that kept the plaintiff out.

Further, the possession of the marshal, as far as the landlord was concerned, was the possession of the defendant. The plaintiff endeavored to gain possession to make what repairs, if any, were necessary, but the conduct of the defendant, through the illegal acts of his sublessee, brought the officers of the law into the premises, and they took charge, not directly as against the plaintiff, but as against the defendant, who was the lessee and under the lease owned all the possessory rights of the premises. If a receiver of the defendant had taken possession, the lease would still stand and rent would accrue, and if there were no lease, he would be liable for use and occupation.

The denial of access, to the plaintiff, for the purpose of discovering the extent of the damage, caused by the fire and to make repairs was, in the eyes of the law, a denial by the defendant. And the result of that

was that the plaintiff was entitled, for the purpose of making repairs, at least, to 30 days after July 15, 1926. Such, we think, in view of the evidence, is a fair interpretation of the lease. The construction contended for by the defendant would permit him to avoid an obligation through his own wrong (*Griffin v. American Gold Min. Co.,* 123 Fed. 283), i. e., solely by reason of illegal acts for which he was, at least, civilly responsible. It is true, the plaintiff by appropriate litigation might have endeavored to oust the custodians, but there was no obligation on him to do so; in fact, it was more properly the right and duty of the defendant, who under the lease owned, as said above, all the possessory rights. To say, therefore, that the 30 days provided for in the lease began to run immediately after the fire is erroneous. On the other hand, that time could not reasonably be said to begin to run until after the custodians left the premises; for prior to that time, in the eyes of the law, the defendant was responsible for the possession of the premises, and his acts prevented the plaintiff's entry.

The judgment will be reversed and the cause remanded with directions to expunge the order of January 8, 1927, and confirming the judgment of June 23, 1926, in favor of the plaintiff.

*Reversed and remanded with directions.*

HOLDOM and WILSON, JJ., concur.