CHICAGO HOUSING AUTHORITY, Plaintiff-Appellant, v. JACQUELINE ROSE, Defendant-Appellee.

First District (6th Division)   No. 1—89—1640

Opinion filed September 14, 1990.

Keck, Mahin & Cate, of Chicago (F. Willis Caruso, Jill E. Evans, Catherine A.T. Nelson, and Katherine M. Clark, of counsel), for appellant.

Cabrini Green Legal Aid Clinic, of Chicago (Richart T. Cozzola and Helen Barrett, law student, of counsel), for appellee.

JUSTICE EGAN delivered the opinion of the court:

The plaintiff, the Chicago Housing Authority (CHA), filed a complaint against the defendant, Jacqueline Rose, seeking possession of the defendant's apartment in the Cabrini-Green public housing project. The CHA maintained that the discovery by the police of two shotguns in the defendant's apartment constituted a violation of her lease. A jury returned a verdict in favor of the defendant. The plaintiff assigns error regarding a jury instruction and limitations on its examination of a police officer.

On December 21, 1987, the CHA filed a complaint against the defendant seeking possession of her apartment in the Cabrini-Green public housing project. According to the "Notice Of Termination of Tenancy," the CHA maintained that the defendant had violated her lease by creating a threat to the health and safety of others. Specifically, the notice stated that the lease was violated when the defendant "Jacqueline Rose, leaseholder, and Charles Gardner, unauthorized occupant in leaseholder's apartment, was [sic] found in possession of a *** sawed-off shotgun and a *** Pump shotgun while at [the defendant's apartment], which is CHA property."

The lease provisions alleged to have been violated stated in pertinent part as follows:

> "(9) The Tenant shall *** (c) use the premises solely as a private dwelling unit for the Tenant, and the Tenant's household as identified in the lease, and not use or permit its use for any other purpose; (d) abide by necessary and reasonable regulations promulgated by Management for the benefit and well-being of the housing project and the tenants which shall be posted in the Project Management Office and incorporated by reference in this lease; *** (k) conduct himself and cause other persons who are on the premises with his consent to conduct themselves in a manner which will not disturb his neighbors' peaceful enjoyment of their accommodations and will be conducive to maintaining the development in a decent, safe and sanitary condition; (l) refrain from illegal or other activity which impairs the physical or social environment of the development."

The relevant regulation incorporated into the lease provided that "[n]o one is permitted to bring explosives, guns, ammunition, air rifles or any other weapons into the buildings or use them on CHA grounds. *** TO DO SO VIOLATES YOUR LEASE AND YOU RISK THE POSSIBILITY OF AN EVICTION." Finally, regarding termination, the lease stated, "Management shall not terminate *** the lease for other than serious or repeated violation of material terms of the

lease such as failure \*\*\* to fulfill the Tenant obligations set forth in paragraph 9 or for other good cause."

The defendant testified as an adverse witness that on May 14, 1987, at approximately 9:30 p.m. her half-brother, Charles Gardner, who is also known as "Little Charles," came to spend the night at her home because he had a summer job interview scheduled for the next day at a nearby day-care center. The defendant met Little Charles in front of her friend Michelle Brewer's apartment, which was across the street from the defendant's apartment; she handed him her key, saw him go up to the apartment, and saw that the light was turned on. The defendant had never seen her brother with guns; she did not learn about the guns' presence in her apartment until the police found them and did not know they belonged to her brother until Little Charles so informed the police at the police station.

Officer Dennis Davis testified that at approximately 9 a.m. on May 15, 1987, he talked with a confidential informant. After that conversation, he went to the State's Attorney's office where he obtained approval of a complaint for a search warrant. Armed with a search warrant, Davis went to the defendant's apartment on May 15, 1987, knocked on the door, and was admitted. The defendant was in the apartment with several other women. Little Charles was not there, nor was there any indication (*e.g.*, men's clothes) that he lived there. The officer first searched the defendant's couch and found a sawed-off shotgun; this gun was about 20 or 22 inches long and was "up in the cushions in the back of the sofa." Then Davis searched "the bedroom, where the rifle was supposed to have been up under the mattress \*\*\* [but t]here was no rifle." Then Davis searched the closet in the living room and found another shotgun. This gun had been "broken down" into two pieces and was in a Christmas tree box. Neither gun was visible before the search. When questioned, the defendant indicated that she did not know who owned the shotguns. Approximately 30 minutes later, at the police station, Little Charles admitted that the shotguns belonged to him. Little Charles also told Davis that he lived at the apartment where the guns were found.

Davis, who specializes in gang activity in north-side housing projects, had never met nor heard of Charles Gardner, nor did he have any information that the defendant was involved in gangs. In his experience, however, Davis knew that gang members hide guns in various places, including the apartments of unsuspecting family members, and that gang members frequently do not disclose the presence of these guns to their relatives. Davis also indicated that hundreds of additional guns are stored in vacant apartments in Cabrini-Green. The

gangs claim various public housing buildings as their own, and it is difficult for a young man who lives in a building claimed by a gang to stay out of the gang, because the gang will beat him up and threaten his family. Often new gang members hide guns as their "first step" with the gang. Davis opined that a person in possession of a sawed-off shotgun and another shotgun at Cabrini-Green is likely to be a gang member.

The CHA rested, and the judge denied the defendant's motion for a directed verdict. The judge held that, when viewing the evidence in the light most favorable to the CHA, the CHA had met its burden of proof of showing that the defendant knew or should have known of the guns and thus violated her lease.

Michelle Brewer, the defendant's friend who lived across the street, testified that she and her six-year-old daughter and the defendant and her four-year-old daughter often stayed together overnight at each other's homes because of the crime and violence in the projects. On May 14, 1987, the defendant and Brewer were in front of Brewer's building, and she saw Little Charles. Little Charles asked the defendant for her key and told the defendant that he was ready to go upstairs and that he had a job interview the next morning. The defendant gave him the key, told him she did not want anyone in her apartment, and told him to turn on the lights in the apartment to let her know that he was inside. Little Charles was alone; he was not carrying any bags and did not have anything in his hands. He went into the building, and the lights went on three or four minutes later. The defendant and Brewer then went up to Brewer's apartment and stayed there for the night. The next time they saw Little Charles was about 10:30 a.m. the next day at Brewer's apartment; he gave the defendant her key and told her that he had been to the interview and was going home. Brewer had never known Little Charles to be in a gang or to have a gun.

The defendant testified to substantially the same facts elicited during her earlier testimony. She added that before May 14, Little Charles had not stayed at her apartment. She confirmed that she and Brewer often stayed together because of the crime in Cabrini-Green. The defendant also confirmed that she told Little Charles that she did not want anyone in the apartment but him, and that she told him to turn on a light when he got into the apartment; after he went in, she waited until she saw the light go on. She did not see any guns in Little Charles' possession at this time or at any time. She did not see Little Charles again until around 10:30 a.m. the following day, when he came to Brewer's apartment and returned the key. Shortly after

noon that day, Officers Davis and Joyce Gordon came to the defendant's apartment. The defendant read the officers' search warrant and invited the officers into the apartment. They searched the apartment and found a gun first in a Christmas tree box in the closet, then another in the sofa. The defendant had never seen the guns before and did not know how they got in her apartment until she heard Little Charles admit at the police station that the guns were his. She would not have let Little Charles into her apartment had she known he was going to bring guns in there.

Following closing arguments, the court instructed the jury as follows:

> "The Chicago Housing Authority has the burden of proving all of the following: [First, that on] May 15, 1987, Charles Gardner was a guest in Jacqueline Rose's apartment ***. [Second, that on] May 15, 1987, Jacqueline Rose or Charles Gardner were [sic] in possession of a 12-gauge sawed-off shotgun and a 12-gauge shotgun while at the above location. Third, that Jacqueline Rose knew or should have known that a 12-gauge sawed-off shotgun or a 12-gauge shotgun was in her apartment May 15, 1987, before that time that the police saw the guns; and, four[th], that the actions of Jacqueline Rose on May 15, 1987 violated *** her lease with the Chicago Housing Authority."

The CHA contends that the instruction was erroneous because it provided that the CHA had the burden of proving that the defendant "knew or should have known that a 12-gauge sawed-off shotgun or a 12-gauge [pump] shotgun was in her apartment [on] May 15, 1987, before that time that the police saw the guns." The CHA argues that a tenant's knowledge of a lease violation is not a requisite element for an eviction based on such a violation. However, if knowledge is required, the CHA argues in the alternative that the defendant had the burden of disproving knowledge and failed to meet this burden.

■ We first consider the defendant's argument that the CHA waived the issue of the propriety of the "knew or should have known" jury instruction. Before trial the CHA moved *in limine* to bar any evidence that the defendant did not know that any person had or brought a gun into her home. The defendant argued that such knowledge was a necessary element of the alleged violation, *i.e.*, permitting weapons on the premises. The judge denied the CHA's motion and, as noted, the judge instructed the jury that the CHA had the burden of proving that the defendant knew or should have known of the guns' presence in her apartment.

An appellant must request transcripts of the reports of proceedings that the appellant desires to be included in the record on appeal. (107 Ill. 2d R. 323(a).) If no transcript is available, "the appellant may prepare a proposed report of proceedings from the best available sources, including recollection." (107 Ill. 2d R. 323(c).) Neither a file-stamped set of proposed instructions filed by the CHA nor a transcript of the instruction conference appears in the record on appeal. In addition, the trial transcript evidences no objection of record to the instruction requiring knowledge. The CHA, as an appellant who failed to provide a transcript or other report of the instructions conference, may not attack the instructions on appeal as no timely objection to the tender of the instructions appears of record. Moreover, the objections in the CHA's post-trial motion came too late to preserve the issue for appeal. (*Finfrock v. Eaton Asphalt Co.* (1976), 41 Ill. App. 3d 1020, 1022, 355 N.E.2d 214, 216.) Consequently, the CHA has waived this issue. See also *Dillon v. U.S. Steel Corp.* (1987), 159 Ill. App. 3d 186, 201, 511 N.E.2d 1349, 1359-60; *Russo v. Kellogg* (1962), 37 Ill. App. 2d 336, 341-42, 185 N.E.2d 377, 380.

Even if the CHA's failure to make a record of its objections to the "knew or should have known" standard did not waive the issue, the CHA's argument must fall. The CHA first claims that the "knew or should have known" standard applied by the trial court is not required by due process and, in fact, improperly interferes with the CHA's fulfillment of its goal to provide safe public housing; instead, the CHA supports a "strict liability" (*i.e.,* no knowledge required) standard. The defendant, on the other hand, argues that a strict liability standard would violate due process by allowing evictions of parties lacking any "causal nexus" to alleged lease violations. However, resolution of these constitutional questions would not resolve whether the *lease* gives the CHA authority to evict the defendant regardless of whether she knew or should have known that the guns were in her apartment. This court has recognized that "a court should not decide a cause on constitutional grounds if it can be determined on other grounds." (*Lake Louise Improvement Association v. Multimedia Cablevision of Oak Lawn, Inc.* (1987), 157 Ill. App. 3d 713, 716, 510 N.E.2d 982, 985.) For reasons to be discussed later, we conclude that the trial court correctly interpreted the lease to require some knowledge on the defendant's part, and we therefore find it unnecessary to discuss the constitutional questions raised by the parties.

In arguing that the defendant's lack of knowledge is irrelevant under the lease, the CHA relies principally on three cases interpreting leases in which the tenant covenanted not to permit the premises to

be used for an unlawful purpose. In the earliest case, *Arado v. Maharis* (1924), 232 Ill. App. 282, the court determined that the plaintiff had waived his right to terminate the lease by accepting rents after learning of the breach, the subtenants' sale of liquor in violation of the law. (232 Ill. App. at 285.) The court reversed the judgment of possession for the plaintiff and added the following *obiter dictum*:

> "There is no merit in the defendant's contention that the plaintiff could not terminate the top lease, unless it appeared that he (the defendant[-tenant]) knowingly permitted the subtenant to violate the law, because the original lease provides that the tenants will not use nor permit the premises to be used for any unlawful purpose. If the premises were used for an unlawful purpose by the subtenant without the knowledge of the top tenant, it would not affect the landlord's right to terminate the lease." 232 Ill. App. at 287.

In the next case, *Lubliner v. Gaston* (1926), 243 Ill. App. 627 (abstract of opinion), the appellate court upheld judgment of forfeiture of a lease in favor of the lessor in an action against the tenants where the evidence established that a subtenant operated a house of prostitution.

In the third case, *First Trust & Savings Bank v. Raklios* (1928), 247 Ill. App. 183, the court affirmed a determination that the tenant's covenant not to permit the premises to be used for an unlawful purpose was a covenant running with the land. Thus, the court held that both the defendant-tenant and the subtenant were bound by the covenant, "yet, in violation of that obligation, [the defendant] sublet the premises to one who \*\*\* pretended to run a radio business \*\*\* [as] a cover for the operation of an illicit still." (247 Ill. App. at 193.) The court refused to allow the defendant to "profit by, what seems to be, his own wrong" by setting up the seizure of the premises by the United States Marshal as a defense to an action for rent. (247 Ill. App. at 192-93.) In so doing, the court's only Illinois citation was to the abstract opinion in *Lubliner* for the proposition that a tenant is responsible to the lessor for a lease violation by his subtenant, regardless of whether the tenant knew of the violation.

Thus, although these cases involved lease language similar to that at issue here, the reasoning of these cases addressed the issue of the accountability of a commercial tenant for a subtenant's violation of criminal laws which was allegedly unknown to the tenant. Those cases are distinguishable from this case, which involves a guest who used the tenant's residential apartment for one night to conceal weapons from the defendant and others. We will not extend the application of

the holdings in the cases cited by the CHA to the facts of this case. To do so would require every tenant under similar leases to be a guarantor of the conduct of anyone invited by the tenant onto the premises.

In construing a lease the primary objective is to ascertain the intent of the parties. The intention of the parties must be ascertained if possible from the language of the lease, and the words used should be given their common and generally accepted meaning. Where the language of a lease is ambiguous, the court may consider the position of the parties, the surrounding circumstances which existed at the time of the execution of the lease and the facts in connection with it. Moreover, where there is any doubt or uncertainty as to the meaning of the language used in a lease it should be construed most strongly against the lessor and in favor of the lessee. *American National Bank & Trust Co. v. Lembessis* (1969), 116 Ill. App. 2d 5, 253 N.E.2d 126.

In common usage, "permit" means *"to consent to expressly or formally*: grant leave for or the privilege of; ALLOW, TOLERATE ***[; or] to give (a person) leave: AUTHORIZE ***." (Emphasis added.) (Webster's Third New International Dictionary 1683 (1981).) A further definition for the term is "To suffer, allow, consent, let; to give leave or license; to acquiesce, by failure to prevent, or *to expressly assent or agree to the doing of an act."* (Emphasis added.) (Black's Law Dictionary 1028 (5th ed. 1979).) Considering the relative positions of the CHA and the defendant in negotiating this lease and construing the lease most strongly against the lessor and in favor of the lessee, the trial court did not err in instructing the jury that, in order to find for the CHA, the jury had to find that the defendant knew or should have known of the presence of the guns in her apartment. This instruction is consistent with the meaning of the term "permit" as incorporated into the lease by way of the CHA's regulation.

As the trial judge noted in ruling on the CHA's motion *in limine,* after the CHA showed that the guns were in the defendant's apartment, a rebuttable presumption that the defendant knew of the guns' presence arose, and the defendant had the burden of showing a lack of knowledge in this regard. The CHA argues in the alternative that, if the trial judge applied the correct knowledge standard, then "there was no evidence presented to show that the tenant did not or could not foresee the obvious consequences of the activity taking place in her apartment." We disagree. Both the CHA and the defendant produced evidence that neither the defendant, nor Michelle Brewer, nor

Officer Davis had any knowledge of Little Charles' involvement with gangs or guns. The defendant's testimony that she did not know of the presence of the guns was not contradicted by testimony or by circumstances, it was not inherently improbable, and her testimony was not impeached. Consequently, her testimony may not be disregarded, even by a jury. (*People ex rel. Brown v. Baker* (1981), 88 Ill. 2d 81, 430 N.E.2d 1126.) Moreover, the guns were not visible before the officer's search of the couch and closet and were, in fact, hidden to avoid detection. This evidence satisfied the defendant's burden of rebutting the presumption of knowledge.

■ The CHA's other claim of error is the trial judge's exclusion of the testimony of Officer Davis regarding statements made to him by a confidential informant concerning the presence of guns in the defendant's apartment. As a basis for admission of such testimony the CHA claims that it is probative on the question of the defendant's knowledge, that it was relevant to show the officer's reasons for searching the defendant's apartment, and that the defendant's cross-examination of the officer opened the door for admission of the officer's complaint for a search warrant, which contained the informant's statements.

In support of its argument, the CHA cites Wigmore on Evidence §266 (3d ed. 1970), which provides:

> "When a person's knowledge *** is a *fact in issue*, *** word utterances may betray the knowledge *** of the *** *speaker*, insofar as the specific act or utterance is of a tenor which cannot well be supposed to have been willed without the inner existence of that knowledge or belief.
>
> * * *
>
> The important thing is that, so far as the evidential fact consists in an utterance of words, it is receivable for the present purpose, as circumstantial evidence; and that, so long as it is offered for that purpose only and not as an assertion to be credited like testimony, it is *not obnoxious to the hearsay rule*. For example, A's mention of X's insolvency is receivable as circumstantial evidence of A's knowledge, but not as testimonial evidence of X's insolvency." (Emphasis added.) (2 J. Wigmore, Evidence §266, at 97, 100 (Chadbourn Rev. ed. 1979).)

The CHA sought to admit the statements of the informant, not to show that the *speaker*, that is, the informant, had knowledge of the guns, but, as the CHA states in it's brief, "as circumstantial evidence that *defendant* had knowledge of the guns." (Emphasis added.) This

purpose, according to Wigmore, is exactly the purpose prohibited.

■ The CHA also argues that the judge committed reversible error in refusing to allow testimony regarding the reason the police officer went to the defendant's apartment, citing the following at trial:

"[CHA's attorney]: Why did you go [to the defendant's apartment]?

[Officer Davis]: I received information that—

[Defendant's attorney]: Objection to the content.

THE COURT: He didn't—Let the record reflect that there has been a motion *in limine*, which was presented prior to the testimony at trial. Counsel, you're admonished that paragraph three was sustained. Make sure you make no inquiries that would violate that term.

[CHA's attorney]: Right. I'm advised. I'm aware of that."

After that exchange, the CHA's attorney proceeded to question the officer on whether he had a search warrant, what such a warrant was generally, how one generally obtained such a warrant, and what happened when the officer went to the apartment. Contrary to CHA's argument, the judge did permit the officer to explain why he went to the apartment; he went to execute a search warrant. The judge properly limited the officer's testimony to the fact that he had a conversation with an individual and that the officer subsequently acted upon information received during that conversation without revealing the substance of the conversation. There was no error in the judge's ruling. See *People v. Gacho* (1988), 122 Ill. 2d 221, 522 N.E.2d 1146.

■ Finally, the CHA argues that the judge improperly prevented it from questioning the officer on redirect examination regarding the complaint for a search warrant after the defendant allegedly opened the door to such questioning on cross-examination. After the officer indicated that his recollection was exhausted on cross-examination as to when he talked with the confidential informant, the defendant, with leave of court and over the CHA's objection, handed the officer his two-page complaint for search warrant, which did refresh the officer's recollection as to when the conversation occurred. Following cross-examination the CHA pursued redirect of the officer. At no time during redirect did the CHA attempt to question the officer regarding the complaint for search warrant. Thus the CHA waived this issue.

Even if this issue were not deemed waived, a refusal by the court to allow redirect examination which would elicit the contents of the complaint for search warrant is not reversible error. A witness' recollection may be refreshed even by a document which itself is inadmissible. (*Scovill Manufacturing Co. v. Cassidy* (1916), 275 Ill. 462, 114

N.E. 181; *People v. Van Dyk* (1976), 40 Ill. App. 3d 275, 352 N.E.2d 327.) After a party uses a document to refresh a witness' recollection, the other party may use the document subject to the court's discretion. But "[n]either inspection of the document nor its employment upon cross-examination makes the document admissible on behalf of the proponent of the witness." (M. Graham, Handbook of Illinois Evidence §612.1, at 458 (5th ed. 1990).) The judge did not err in denying the plaintiff the right to introduce the contents of the search warrant.

In summary, we conclude that no error was committed in the giving of the defendant's instruction nor in the examination of the witnesses. For these reasons the judgment of the circuit court is affirmed.

Judgment affirmed.

LaPORTA, P.J., and RAKOWSKI, J., concur.