DIVERSIFIED REALTY GROUP, INC., for the United States Department of Housing and Urban Development, Plaintiff-Appellant, v. MARY DAVIS, Defendant-Appellee.

First District (6th Division)   No. 1—92—2861

Opinion filed December 30, 1993.

418

Sanford Kahn, Ltd., of Chicago (Richard W. Christoff, of counsel), for appellant.

Legal Assistance Foundation of Chicago, of Chicago (Naomi Avendano, Vivian R. Hessel, and Richard M. Wheelock, of counsel), for appellee.

JUSTICE GIANNIS delivered the opinion of the court:

Plaintiff, Diversified Realty Group, Inc. (Diversified), filed an action for possession of the premises occupied by defendant, Mary Davis (Davis). Diversified's suit was predicated upon an alleged breach by Davis of certain provisions of her lease which Diversified claimed gave it the right to terminate. The trial court ultimately granted Davis' motion for summary judgment and denied Diversified's cross-motion for summary judgment. Diversified appeals pursuant to Illinois Supreme Court Rule 301 (134 Ill. 2d R. 301).

Diversified raises two issues: (1) whether the terms of Davis' federally subsidized lease allow Diversified to terminate Davis based upon the illegal conduct of Davis' guest; and (2) if so, whether the trial court's granting of summary judgment in Davis' favor was proper.

On August 24, 1990, Diversified as lessor and Davis as lessee entered into a written lease for a residential apartment. Incorporated into the lease was a separate document entitled "Rules and Regulations." The apartment building was owned by the United States Department of Housing and Urban Development (HUD), and Davis received a rental subsidy through a Federal program designed to assist lower-income families. See United States Housing Act, 42 U.S.C. § 1401 et seq. (1988); 24 C.F.R. § 886.301 (1993).

On December 5, 1990, Chicago police officers Peter Piper and Patrick Scanlan arrested Steven Thompson for possession of cocaine in the same building where Davis lived. At that time, Thompson advised the arresting officers that he had obtained the cocaine from Davis' unit. The officers then proceeded to Davis' unit. One of Davis' sons, Chandell Davis, answered the door and allowed the officers to search the apartment. Davis was not home at the time. During the search and inside one of the bedrooms the officers found a Deering mixer-grinder containing a white powder residue. The mixer was located inside a duffle bag. According to Officer Piper, Chandell told the officers that it was both his bedroom and his mixer. He was then placed under arrest. Charges against Chandell were dropped, however, after evidence indicated that the grinder may have been owned by his stepbrother, Carl Felton.

On April 8, 1991, Diversified issued and served upon Davis a 10 days' notice of termination of tenancy indicating that Davis' lease had been breached. (See Chicago Municipal Code § 5—12—130 (1992).) The notice stated that Davis had a controlled substance and drug paraphernalia in her unit. When Davis failed to vacate the unit pursuant to the notice, Diversified filed this suit for possession of the premises on April 19, 1991.

On February 24, 1992, Davis filed her motion for summary judgment. In the motion Davis stated that she had no knowledge or reason to believe that her older son, Carl Felton, had left his drug paraphernalia in her unit. Attached to the motion are affidavits from Felton and Davis which state that Felton did not live in the unit at the time of Chandell Davis' arrest.

On that same day Diversified filed a cross-motion for summary judgment. In the cross-motion Diversified claimed that sufficient grounds for termination of the tenancy existed as a result of the acknowledged acts of Davis' son in keeping his cocaine grinder in the apartment.

On March 25, 1992, the trial court denied Diversified's cross-motion for summary judgment and reserved Davis' motion for summary judgment for trial on the issue of whether Davis should have known what was included among her son's possessions. Subsequently, however, on April 20, 1992, Davis filed a motion asking for reconsideration of the court's ruling. The trial court granted this motion on April 30, 1992, and entered summary judgment in Davis' favor.

Diversified subsequently filed a motion to reconsider the trial court's entry of summary judgment in favor of Davis which was denied. Diversified subsequently filed this timely appeal.

We begin our consideration of the issues raised by Diversified by

noting that summary judgment is proper only where the pleadings, depositions, admissions, and affidavits demonstrate that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. (Ill. Rev. Stat. 1991, ch. 110, par. 2—1005.) Summary judgment is a drastic remedy to be granted only where the movant's right to it is clear and free from doubt. (*Sutton v. Washington Rubber Parts & Supply Co.* (1988), 176 Ill. App. 3d 85, 88, 530 N.E.2d 1055, 1057.) If the facts will allow more than one conclusion or inference, summary judgment must be denied. *Sutton*, 176 Ill. App. 3d at 88.

In order to prevail on a summary judgment motion, the movant's evidence must be sufficient to meet the clear and convincing evidence standard. This standard has been defined as "that quantum of proof which leaves no reasonable doubt in the mind of the trier of fact of the truth of the fact in issue." (*La Salle National Bank v. 850 De Witt Condominium Association* (1991), 211 Ill. App. 3d 712, 718, 570 N.E.2d 606.) Where a party moving for summary judgment files supporting affidavits containing well-pleaded facts and the party opposing the motion files no counteraffidavits, the material facts set forth in the movant's affidavits stand as admitted. *Wooding v. L&J Press Corp.* (1981), 99 Ill. App. 3d 382, 425 N.E.2d 1055.

Diversified first argues that the language of Davis' lease is unambiguous and that termination is appropriate as a matter of law because Davis does not contest the fact that her guest committed an illegal act within her apartment. Diversified relies upon one of the rules incorporated into Davis' lease which states in part:

"22. *** Resident's shall be responsible and liable for the acts of their guests. Acts of guests in violation of the lease, or Management's rules and regulations, may be deemed by Management to be a breach by Resident."

Paragraphs 13(b) and (c) of the lease provide that the tenant "agrees not to use the unit for unlawful purposes" or to "engage in or permit unlawful activities in the unit." Diversified claims that it may attribute Carl Felton's possession of the cocaine contained in the grinder to Davis under rule 22 and that it may terminate tenant's lease under the terms of paragraphs 13(b) and 13(c) as if she herself hid the cocaine grinder in the apartment. In Diversified's view the trial court improperly considered Davis' claims that she had no knowledge of Carl Felton's possession of cocaine because tenant knowledge of the unlawful activities is not required for termination under the lease.

Davis notes that Diversified's interpretation of rule 22 has the effect of making her strictly liable for the acts of her guests. She

argues that such an interpretation violates due process of law, however, in that it allows Diversified to evict her without any showing of a "causal nexus" between herself and the acts of others. She relies principally upon *Tyson v. New York City Housing Authority* (S.D.N.Y. 1974), 369 F. Supp. 513, for the proposition that such a nexus is constitutionally necessary before a government benefit such as Davis' subsidy can be taken.

In addition, Davis claims that termination of her tenancy under rule 22 violates paragraph 23(b) of the lease. This provision provides as follows:

"Any termination of this Agreement by the Owner must be carried out in accordance with HUD regulations, State and local law, and the terms of this Agreement. The Owner may terminate this Agreement only for:

(1) the Tenant's material noncompliance with the terms of this Agreement;

(2) the Tenant's material failure to carry out obligations under any State Landlord and Tenant Act; or

(3) other good cause, which includes but is not limited to the Tenant's refusal to accept the Owner's proposed change to this Agreement.

Material noncompliance includes, but is not limited to, nonpayment of rent beyond any grace period available under State law; failure to reimburse the Owner within 30 days for repairs made under paragraph 11 of this Agreement; repeated late payment of rent; permitting unauthorized persons to live in the unit; serious or repeated damage to the unit or common areas; creation of physical hazards, serious or repeated interference with the rights and quiet enjoyment of other tenants; failure to repay unauthorized assistance payments; and giving the Owner false information regarding income or other factors considered in determining the Tenant's rent."

She argues that the "materiality" and "good cause" language found in paragraph 23(b) precludes Diversified from evicting her as a matter of contract law when the facts indicate that she was without any knowledge or fault for her guest's criminal conduct. Because we agree with this argument, we find it unnecessary to address Davis' constitutional claim.

■ A lease in Illinois is a contract subject to the same law governing all contracts. (*Kerr Steamship Co. v. Chicago Title & Trust Co.* (1983), 120 Ill. App. 3d 998, 1005, 458 N.E.2d 1009.) Where the terms of a lease are clear and unambiguous, they must be given their plain and ordinary meaning. (*Lewis v. Loyola University* (1986), 149 Ill. App. 3d 88, 500 N.E.2d 47.) In this case Davis' lease limits

termination to "[t]enant's material noncompliance" with the lease. The lease provides a listing of the type of "noncompliance" deemed sufficient to justify termination, and paragraph 23(b)(3) indicates that terminations may not occur without there being some measure of "good cause."

Similar "cause" language was analyzed in *Spence v. Gormley* (1982), 387 Mass. 258, 439 N.E.2d 741. In *Spence*, the Supreme Judicial Court of Massachusetts found that tenant evictions from subsidized housing could be predicated upon lease terms similar to those at issue here, but also found a statutory requirement that tenant evictions occur only for "cause" to prohibit eviction when the tenant could point to "special circumstances" indicating that she could not foresee or prevent the offensive conduct of her guest. (*Spence*, 387 Mass. at 263, 439 N.E.2d at 745.) According to the court, violent acts committed on the premises by household members can constitute "cause" to terminate the tenancy, but there must be "some connection between the tenant and the conduct underlying the termination." (387 Mass. at 263, 439 N.E.2d at 745.) The *Spence* court stated that "[a] determination to evict entire families for acts that they could not avert by any means, while it might not be arbitrary or irrational in the constitutional sense, is nevertheless contrary to the concept of fair and reasonable treatment implicit in the requirement of 'cause.' " 387 Mass. at 263, 439 N.E.2d at 745.

■ Similar to the statutory language analyzed in *Spence*, paragraph 23(b) is clearly intended to give tenants such as Davis some measure of objective protection against termination absent a serious lease infraction. While we recognize that rule 22 of the lease also provides that a tenant may be held "responsible" for the conduct of her guests and that this may result in a "breach" of the lease, rule 22 must be read in a way that is consistent with paragraph 23(b), particularly since the language of paragraph 23(b) is federally mandated. While we believe that there is nothing generally inconsistent in holding a tenant "responsible" for the acts of her guests, we think that, at a minimum, the language employed by paragraph 23(b) demands that Davis *herself* have some minimum connection with the unlawful conduct before there can be said to be "good cause" to evict her.

In this case Davis offered her affidavit to the court which states that she had never seen her son, Carl Felton, use or have drugs or drug paraphernalia in her apartment. She also states that she had no reason to believe that her younger son, Chandell Davis, had any involvement with drugs of any kind and that she did not go through Felton's belongings because she had no reason to believe that his

possessions included drug paraphernalia. This sworn statement is supported by an affidavit from Felton himself.

Nothing in the police report submitted by Diversified indicates that Davis had any knowledge of the existence of the grinder in her home or that she should have been on notice that her son was likely to commit a criminal act while in the apartment. Diversified countered Davis' affidavits with no evidence that Carl Felton had previously committed drug infractions on the premises or otherwise indicated that Felton could be reasonably expected to have committed a serious criminal act there.

Under these facts, we think the only reasonable inference is that Carl Felton deliberately and successfully hid his involvement with drugs from his mother and that she had no knowledge of the contents of the duffle bag inside her unit. We reject Diversified's argument that the tenant should be held to some form of "constructive knowledge" of her son's illegal activity because she knew him to be undergoing drug rehabilitation at the time the drugs were found. Indeed, we believe this fact militates in favor of Davis' claims that she did not reasonably expect her son to have drugs in the apartment.

For the foregoing reasons, the order of the circuit court is affirmed.

Affirmed.

McNAMARA, P.J., concurs.

JUSTICE RAKOWSKI, dissenting:

Because the language in rule 22 is unambiguous and the tenant's constitutional claim is without merit, I would reverse the summary judgment for the tenant and enter summary judgment in favor of the landlord as a matter of law.

I initially note that the majority does not address the tenant's constitutional claim. I submit, nevertheless, that it is without merit. With the exception of *Tyson v. New York City Housing Authority* (S.D.N.Y. 1974), 369 F. Supp. 513, all of the due process cases cited by the tenant involve *procedural* due process, an argument that the tenant *sub judice* did not and could not make.

In order to establish a denial of *substantive* due process based upon a State-created property interest, it is necessary to allege "either a violation of some other substantive constitutional right or that state law remedies are inadequate." (*Polenz v. Parrot* (7th Cir. 1989), 883 F.2d 551, 558.) Because the tenant does not have a constitutional right to "decent, safe and sanitary housing" (*Hurt v. Philadelphia*

*Housing Authority* (E.D. Pa. 1972), 806 F. Supp. 515, 529; *Lindsey v. Normet* (1972), 405 U.S. 56, 74, 31 L. Ed. 2d 36, 50-51, 92 S. Ct. 862, 874) and has not claimed a violation of some other constitutional right or that the available State law remedies are inadequate, she has failed to meet the threshold requirement as expressed in *Polenz*.

Additionally, the very argument advanced by the tenant *sub judice* was rejected in *Chavez v. Housing Authority* (5th Cir. 1992), 973 F.2d 1245, where the court stated:

"Chavez's final argument is based on the due process clause. She argues that the EPHA's termination of her lease amounts to punishment of an innocent party for the acts of another person over which she has no control. Once again, Chavez bases her argument on the assertion that she is losing her apartment because of her familial relationship with her son. This argument lacks merit. Chavez is not being punished for the actions of her son. She is being evicted for failing to ensure that her guests do not disturb or endanger others in her community." *Chavez*, 973 F.2d at 1249.

The only case which in any way supports the tenant's argument is easily distinguishable. The decisive utterance in *Tyson* is that the tenant's complaint for injunctive relief and declaratory judgment stated a cause of action because the procedural regulation under which plaintiffs were determined to be "non-desirable tenants" was unconstitutionally vague and overbroad and violated HUD regulations. (*Tyson*, 369 F. Supp. at 520.) The *Tyson* court goes on, by way of *dicta*, to require a finding of "personal guilt" in order to satisfy due process and in support cites *Scales v. United States* (1961), 367 U.S. 203, 6 L. Ed. 2d 782, 81 S. Ct. 1469. *Scales*, however, was a criminal conviction under the Smith Act and thus involved criminal penalties. As a result, *Tyson* is both distinguishable and of questionable precedential value. See *Spence v. Gormley*, 387 Mass. at 268, 439 N.E.2d at 748.

Similarly, defendant's suggestion that rule 22 violates the equal protection clause of the constitution must also be rejected. Nowhere does defendant assert that plaintiff has a policy of holding tenants responsible for the acts of relatives that is different from its policy applied to nonrelative guests. Her unarticulated equal protection argument therefore fails because she has not demonstrated that any irrational classification scheme exists. *Chavez*, 973 F.2d at 1248.

Absent any valid constitutional claim, the dispute is one of

contract law. While the tenant argues that rule 22[1] is ambiguous and in conflict in paragraph 23(b)[2] , both positions are without merit.

Rule 22 does not contain any good cause language nor is there any requirement for "personal guilt or knowledge." It clearly and unambiguously states "[A]cts of guests in violation of the lease, or management's rules and regulations may be deemed by management to be a breach by resident." Given the near impossible evidentiary problems of a "personal guilt or knowledge" requirement, it is easy to understand why such language was omitted from the lease.

Nor does a fair reading of paragraph 23(b) change the result. Clearly, possession of narcotics or narcotic paraphernalia constitutes material noncompliance with the terms of the lease. While several specific examples of material noncompliance are presented, that paragraph states that "[m]aterial noncompliance includes, but is not limited to." Reality would dictate why a landlord would not attempt to set forth a laundry list of all situations that would constitute material noncompliance.

While paragraph 23(b)(3) does allow for eviction based upon "other good cause," such language is in addition to (1) material noncompliance and (2) tenant's refusal to carry out obligations under the State landlord and tenant act. Further, the very use of the language "*other* good cause" (emphasis added) in paragraph (3) implies that paragraphs (1) and (2) constitute good cause. Because "material noncompliance" constitutes a basis for termination, separate and in addition to "*other* good cause" (emphasis added), the only case cited by the majority in support of its position, *Spence v. Gormley* (1982), 387 Mass. 258, 439 N.E.2d 741, is easily distinguishable. In *Spence*, the supreme court of Massachusetts upheld the evictions of two Boston Housing Authority tenants based upon the criminal conduct (arson) of their respective sons. Before disposing of the

---

[1]"22. \*\*\* Residents shall be responsible and liable for the acts of their guests. Acts of guests in violation of the lease, or Management's rules and regulations, may be deemed by Management to be a breach by Resident."

[2]"Any termination of this Agreement by the Owner must be carried out in accordance with HUD regulations, State and local law, and the terms of this Agreement. The Owner may terminate this Agreement only for:
    (1) The Tenant's material noncompliance with the terms of this agreement;
    (2) The Tenant's material failure to carry out obligations under any State Landlord and Tenant Act;
    or
    (3) Other good cause, which includes but is not limited to the Tenant's refusal to accept the Owner's proposed change to this Agreement."

tenants' constitutional claims in favor of the landlord, the *Spence* court addressed Massachusett's statute, Mass. Gen. Laws Ann. ch. 121B, § 32 (West 1989), which provides that a housing authority cannot terminate a tenancy without cause. Regarding the statute, which has no counterpart in Illinois, the court stated:

> "As will be seen, we are not persuaded that 'personal responsibility' is a constitutional prerequisite to eviction for the acts of household members. Nevertheless, we prefer to read the statute in a way that will avoid constitutional doubts. [Citation.]

> This is not to say that we endorse, in our construction of § 32, the tenants' proposal that the BHA cannot terminate their tenancies without affirmative proof that they knew or had reason to know of their sons' violent propensities, and were able to control their sons' conduct. Cf. *Caldwell v. Zaher*, 344 Mass. 590, 592, 183 N.E.2d 706 (1962). The requirement we discern in § 32 is not so broad. When the wrongdoer is a household member, a fair inference exists that the tenant is aware of potential problems, and able to exercise some influence or otherwise prevent violent and destructive conduct on the premises. Problems of unfairness arise only because this may not hold true in every case. Accordingly, we understand the 'cause' requirement of § 32 simply to mean that a tenant should not be evicted if special circumstances are present to negate the inference that she could have averted the lease violation. In other words, if the tenant can show that she could not have foreseen and prevented her son's violence, there is no 'cause' to evict her within § 32." *Spence*, 387 Mass. at 264-65, 439 N.E.2d at 745-46.

While the majority opinion seems to imply that a good cause requirement exists in Illinois, it cites no authority for such a proposition. As previously stated, the good cause language in paragraph 23(b) is not a *requirement* before which eviction can take place, but rather a *basis* for eviction which is in addition to material noncompliance (1) and noncompliance with the landlord and tenant act (2).

In sum, absent a valid constitutional or statutory claim, the agreement between the parties is purely contractual. While the concepts of "personal guilt" or fault apply to the criminal and tort law, neither the tenant nor the majority opinion cites to any authority for ingrafting such a requirement to the law of contract.

Finally, contrary to the majority position, a fair and complete reading of *Spence* entirely supports a grant of summary judgment in favor of the landlord.