KIMBALL HILL MANAGEMENT COMPANY, as Agent, Plaintiff-Appellee, v. TERRI ROPER, Defendant-Appellant.

Second District No. 2—99—0470

Opinion filed July 20, 2000.

Tammie R. Grossman, Sarah Megan, and Bernard H. Shapiro, all of Prairie State Legal Services, Inc., of Batavia, for appellant.

Richard W. Christoff, of Sanford Kahn, Ltd., of Chicago, for appellee.

JUSTICE GALASSO delivered the opinion of court:

Plaintiff, Kimball Hill Management Company, operates and administers Foxview Apartments (Foxview) in Carpentersville. Foxview is a federally assisted housing project under the United States Housing Act of 1937, section 8, as amended (section 8) (42 U.S.C.A. § 1437(f) (West 1994)), a program for people with low incomes, people with disabilities, and the elderly. In October 1997, defendant, Terri Roper, became a tenant at Foxview. In the notice of termination of tenancy, dated November 17, 1998, plaintiff listed the reasons for the termination of tenancy. The first allegation was that on or about June 19, 1998, defendant had an unauthorized person living in her apartment, namely, her brother, Edward Roper (Edward). The second allegation was that on or about June 19, 1998, an illegal gun, illegal cannabis, and stolen property were confiscated by police in her apartment. The third allegation was that on or about June 16, 1998, crack cocaine was sold out of her apartment. On December 8, 1998, plaintiff filed a complaint in forcible entry and detainer against defendant for various violations of her lease. After a bench trial, the trial court found for plaintiff on the allegation related to illegal cannabis and ordered possession of the subject apartment in question to plaintiff. Defendant's motion for reconsideration was later denied, and this timely appeal followed. Subsequently, defendant filed a motion for a stay of enforcement. On May 5, 1999, the trial court granted the motion, conditioned on defendant's payment of accrued rent and, thereafter, monthly rent as it came due.

On appeal, defendant raises one general issue, namely, whether

the trial court erred in holding defendant strictly liable for a third party's criminal activity that occurred in her home without her knowledge or consent.

The record on appeal contains the agreed statement of facts, from which the following relevant facts are taken. At the relevant time, Foxview was comprised of section 8 apartments, and defendant's tenancy was subsidized by the United States Department of Housing and Urban Development (HUD). As a subsidized tenant, defendant paid 30% of her adjusted annual income towards her monthly rent and the balance of her rent was paid by HUD to Foxview.

At the trial, Detective McGovern testified that he was a member of the Carpentersville police department's narcotics task force. On June 18, 1998, he obtained a search warrant for 13 Oxford Road, Unit 5, Carpentersville, Illinois. Later testimony identified this as defendant's apartment. McGovern testified that at 6 p.m. on June 18, 1998, he arrived at the subject address to execute the search warrant. McGovern testified that the search warrant had specified "a black male and various electronic equipment." According to McGovern, the apartment's door was not opened voluntarily, and it was necessary to break into the apartment with the use of a "ram." At the time of McGovern's entrance into the apartment, Edward was in the downstairs living room, and defendant and her children were upstairs. McGovern further testified that, in his search of the apartment, he found cannabis, a .380-semiautomatic handgun, seven rounds of ammunition, a VHS recorder, and two speakers. The handgun and ammunition were located on the top of the kitchen cabinets. McGovern stated that he found the VHS recorder and speakers on top of a television set. McGovern also located what appeared to be cannabis on an end table in the living room. According to McGovern, a person standing in the living room door would have been able to observe the cannabis. A field test performed on the substance by McGovern tested positive for cannabis.

McGovern stated that, following the search, defendant and Edward were transported to the Carpentersville police station. At approximately 12:30 a.m. on June 19, 1998, defendant was questioned by McGovern and Officer Mark Rasmussen. Defendant denied any knowledge that the cannabis, handgun, or ammunition was in her apartment. She further denied that she knew that any of the electronic equipment was stolen.

On cross-examination, McGovern acknowledged that, at the time the search commenced, defendant and her two children were in the upstairs of unit 5. He conceded that the handgun and ammunition were not visible upon entry into the kitchen. McGovern could not recall if defendant told him anything about undergoing dialysis treatment.

Plaintiff next called Kelly Smith, a forensic scientist with the Department of State Police. Defendant stipulated that Smith would testify that the leafy substance found in defendant's apartment was cannabis.

Plaintiff rested its case, and defendant's motion for a directed finding was denied.

Defendant, age 40, testified that she had lived at the subject apartment for a little over two years. She resided there with her two children, Patricia and Prentiss, ages 10 and 8, respectively. Defendant stated that her income sources were public aid benefits and supplemental security income (SSI), based on her disabilities of kidney disease and a heart condition. According to defendant, she received kidney dialysis treatment three times a week for two to three hours' duration at Sherman Hospital in Elgin, Illinois. She testified that she was "at the bottom of the dialysis list" and, as a result, had to accept whatever time she was given to undergo dialysis. Defendant stated that she would die if she did not receive the dialysis treatments.

Defendant stated that on June 18, 1998, she asked her brother, Edward, to babysit her children while she was undergoing a dialysis treatment. He agreed to do so. Defendant testified that Edward was not her usual babysitter. She stated that her mother usually babysat the children but that on June 18 her mother was ill and unable to oversee the children. Defendant stated that on June 18 she left her home, taking the Pace bus, at approximately 2 p.m. and returned at about 6 p.m. According to defendant, upon arriving home, she sat for a few minutes on the apartment's porch because the dialysis treatments made her ill. Defendant then entered the apartment and went upstairs with her children. Within minutes, she heard a loud noise, and the police entered her apartment. She stated that she told the police that her daughter was in the bathroom and then asked that they not scare her. Defendant further testified that she fully cooperated with the police during the search and was later taken to the police station. During police questioning, she denied any knowledge of the handgun, ammunition, cannabis, or stereo equipment. Defendant was not charged with any offenses related to the subject search of her apartment.

Defendant further testified that the cannabis was not present in her apartment when she left for dialysis treatment. She also had no knowledge that there was a gun and ammunition on the top of her kitchen cabinets. Defendant stated that she would need to use a chair to see above the cabinets and that her disability would prevent her from using a chair to see above the cabinets because she became dizzy easily.

During cross-examination, defendant testified that she was awarded SSI payments at the end of September 1998 and immediately notified the management at Foxview. On June 18, 1998, she cleaned her apartment prior to leaving for her dialysis treatment. Defendant testified that there was no cannabis on an end table in the living room when she left her home that day. She stated that when she arrived home from the dialysis treatment Edward and her children were outside. Edward was standing with a group of people. After entering her apartment, she went immediately upstairs and did not enter or look into the living room. According to defendant, she did not observe the television set or the speakers at the top of the set. Immediately after she went upstairs, the police arrived, at which time she heard loud talking and the sound of a battering ram. After being shown a photograph that was part of plaintiff's exhibit No. 3, defendant admitted that there were sandwich baggies on the top of the kitchen cabinet above the sink. She acknowledged that there was a "step stool" in her apartment but that she was in no physical condition to use it.

After brief oral argument, the trial court ruled that plaintiff had failed to present sufficient proof to support the first (unauthorized person) and third (selling crack cocaine) allegations. The court further found that there was insufficient evidence regarding the electronic equipment and the handgun and ammunition. It ordered the parties to brief the issue of whether defendant could forfeit possession of the apartment due to the cannabis found on the end table. The parties submitted briefs, and, after a hearing, the trial court ruled for plaintiff, finding that defendant had violated paragraphs 13(c)(1) and 13(c)(2) of the lease, which are set out below. Moreover, the trial court determined that Edward was under defendant's control because he was her baby-sitter.

■ Defendant first argues that the subject lease is ambiguous and cannot serve as the basis for terminating her tenancy. She maintains that she cannot be held responsible for her brother's illegal activities of which she had no knowledge. In response, plaintiff contends that the trial court's judgment for possession is supported by the subject lease, which does not require proof of defendant's knowledge of her brother's illegal activity as a condition for the termination of her tenancy. Additionally, plaintiff denies that the lease is ambiguous and also maintains that defendant waived this argument by failing to argue it before the trial court.

We will first deal with plaintiff's contention that defendant waived this argument. Specifically, plaintiff argues that the ambiguity issue was never raised either at trial or in her trial memorandum and that it was not asserted until her motion to reconsider. In response, defen-

dant contends that it was not until the trial court's ruling, which relied on the lease language found in paragraph 13(c), that she knew to argue the ambiguities to the specific lease provisions. She further maintains that plaintiff does not indicate that it was in any way prejudiced by the specific assertion of the ambiguity argument in the posttrial motion.

We agree with plaintiff that it is generally appropriate for a party to raise a specific issue prior to or during trial. However, the following language taken from plaintiff's response to defendant's motion to reconsider indicates that the issue of ambiguity was at least implicitly a part of the arguments made at trial:

> "Defendant has not submitted anything new. She has not presented any new evidence of any nature. She has not made any arguments which the court did not consider and reject in making its initial findings and ruling."

Accordingly, we find that this argument has not been waived.

We now address defendant's contention that the language of paragraph 13(c) of the lease, relied upon by the trial court to find that defendant was not in compliance with the lease, is ambiguous and the ambiguity should be construed against plaintiff. As indicated above, plaintiff maintains that paragraph 13(c) contains no such ambiguity.

■ Initially, we note that it is axiomatic that a lease is a contract subject to the law of contracts. *Williams v. Nagel*, 162 Ill. 2d 542, 555 (1994). A contract must be read in its entirety and effect given to each of its provisions. *American Apartment Management Co. v. Phillips*, 274 Ill. App. 3d 556, 559 (1995). Where there is any doubt or uncertainty as to the meaning of the language used in a lease, it should be construed most strongly against the lessor and in favor of the lessee. *Chicago Housing Authority v. Rose*, 203 Ill. App. 3d 208, 216 (1990).

The lease contains the following relevant language:

> "13. General Restrictions: *** The tenant agrees to not to:
> * * *
> (c) *engage in or permit* unlawful activities in the unit, in the common areas or on the project grounds:
>> (1) Lessee, any members of Lessee's household, or a guest or other person, *with or without the actual knowledge of the Lessee*, shall not engage in criminal activity, including drug-related criminal activity, on or near the project premises. ***
>> (2) Lessee, any member of Lessee's Household, or a guest or other person, *with or without the actual knowledge of Lessee*, shall not engage in any act intended to facilitate criminal activity, including drug related criminal activity on or near the project premises." (Emphasis added.)

We note that there are seven subsections of paragraph 13(c), but we

find it unnecessary to include subsections (3) through (7), as the trial court cited only paragraphs 13(c)(1) and (c)(2) in support of its determination that defendant had violated her lease.

Defendant specifically maintains that the introductory language to paragraph 13(c) requires some knowing involvement of the tenant in the offending conduct. She further argues that this introductory language modifies all of the seven subsections that follow. Defendant then points to language in paragraphs 13(c)(1) and (c)(2), namely, "with or without the actual knowledge of the Lessee" and asserts that, when such language is coupled with the introductory language, the result is "perplexing and ambiguous language." She concludes that this ambiguity should be construed against plaintiff and in defendant's favor. Plaintiff responds that subsections (1) through (7) of paragraph 13(c) stand by themselves and are not modified by the introductory language of paragraph 13(c). Plaintiff also asserts that there is no ambiguity in the subject portion of the lease.

■ Contract language must not be rejected as meaningless or surplusage, and, as a result, it is presumed that the terms and provisions of a contract are purposely inserted and that the language was not idly employed. *Sheehy v. Sheehy*, 299 Ill. App. 3d 996, 1000-01 (1998). Thus, contrary to plaintiff's position, the disputed language cannot simply be ignored. After reviewing the lease, we conclude that the above-cited introductory language of paragraph 13(c) does indeed modify the seven subsections that follow; otherwise, the said language is without meaning or purpose.

Focusing on the introductory language of paragraph 13(c), clearly, the term "engage in" contemplates the tenant's knowing involvement in the criminal activity. Further, Black's Law Dictionary defines the term "permit" as "[t]o consent to formally *** [t]o give opportunity for." Black's Law Dictionary 1160 (7th ed. 1999). Applying this definition to the language of the lease, we find that it indicates that the tenant must knowingly condone the criminal activity. Accordingly, the effect of the "engage in or permit" language is to add the element of tenant's knowledge to all of the restricted actions listed in the seven subsections. This modifying language obviously conflicts with the "with or without knowledge" phrase found in paragraphs 13(c)(1) and (c)(2). The resulting ambiguity must be construed against plaintiff and in defendant's favor. *American Apartment Management Co. v. Phillips*, 274 Ill. App. 3d 556, 566 (1995). As a result, we conclude that the trial court erred in finding that paragraphs 13(c)(1) and (c)(2) were proper bases for the termination of defendant's lease.

Additionally, we note that, due to this lease's ambiguity regarding the relevance of the tenant's knowledge of the criminal activity, the

principal state and federal cases cited by plaintiff are factually distinguishable from the instant appeal. In those cases, the reviewing courts concluded that, unlike the instant lease language, the relevant language of the various leases was clearly unambiguous, *i.e.*, the tenant was strictly liable for the criminal activity of guests and others.

The parties also argue over whether paragraph 23(b) serves as a basis to terminate defendant's lease. This paragraph provides:

"Any termination of this Agreement by the Owner must be carried out in accordance with HUD regulations, State and local law, and the terms of this Agreement. The Owner may terminate this Agreement only for:

(1) the Tenant's material noncompliance with the terms of this Agreement;

(2) the Tenant's material failure to carry out obligations under any State Landlord and Tenant Act; or

(3) other good cause, which includes but is not limited to the Tenant's refusal to accept the Owner's proposed change to the Agreement. Terminations for 'other good cause' may only be effective as of the end of any initial or successive term.

Material noncompliance includes, but it is not limited to, nonpayment of rent beyond any grace period available under State law; failure to reimburse the Owner within 30 days for repairs made under paragraph 11 of this Agreement; repeated late payment of rent; permitting unauthorized persons to live in the unit; serious or repeated damage to the unit or common areas; creation of physical hazards, serious or repeated interference with the rights and quiet enjoyment of other tenants; failure to repay unauthorized assistance payments; and giving the Owner false information regarding income or other factors considered in determining the Tenant's rent."

Other Illinois courts have addressed the issue of whether the language of paragraph 23(b) allows for the termination of a lease where the tenant was without knowledge of or fault for a guest's criminal conduct. In *Diversified Realty Group, Inc. v. Davis*, 257 Ill. App. 3d 417 (1993), the tenant/defendant Mary Davis (Davis) entered into a written lease for a federally subsidized residential apartment with Diversified Realty Group, Inc. (Diversified). The *Diversified* lease contained a paragraph 23(b) that is virtually identical to the above cited paragraph 23(b) of the subject lease. Further, rule 22 of the *Diversified* lease provided in relevant part:

"Residents shall be responsible and liable for the acts of their guests. Acts of guests in violation of the lease, or Management's rules and regulations, may be deemed by Management to be a breach by Resident." 257 Ill. App. 3d at 425 n.1.

During a police search of Davis's apartment, a "mixer-grinder" containing white powder residue, which was later determined to be cocaine, was found in a duffel bag located in a bedroom. There was no evidence that Davis had any knowledge of the mixer-grinder in her apartment or that she was on notice that one of her sons was likely to commit a criminal act while in the apartment. Though all criminal charges arising from the seizure of the mixer-grinder were eventually dropped, Diversified sought to terminate Davis's lease because drug paraphernalia and a controlled substance had been found in her apartment. Summary judgment was subsequently entered in Davis's favor. Diversified appealed, arguing, *inter alia*, that, pursuant to rule 22, it could attribute the actions of the person who hid the mixer-grinder in the apartment to Davis and that under paragraphs 13(b) and 13(c) it could terminate Davis's lease, as if she herself had hidden the mixer-grinder in her apartment. In response, Davis contended in part that the termination of her lease under rule 22 violated paragraph 23(b) of the lease. Davis further maintained that the "materiality" and "good cause" language found in paragraph 23(b) precluded Diversified from evicting her as a matter of contract law, where the facts did not demonstrate that she had any knowledge of or fault related to the guest's criminal conduct.

The *Diversified* court noted that the Davis lease provided a listing of the types of "non-compliance" that were sufficient to support termination of the lease and that paragraph 23(b)(3) indicated that terminations may not occur without some measure of "good cause." *Diversified*, 257 Ill. App. 3d at 422. The court then stated:

"Similar 'cause' language was analyzed in *Spence v. Gormley* (1982), 387 Mass. 258, 439 N.E.2d 741. In *Spence*, the Supreme Judicial Court of Massachusetts found that tenant evictions from subsidized housing could be predicated upon lease terms similar to those at issue here, but also found a statutory requirement that tenant evictions occur only for 'cause' to prohibit eviction when the tenant could point to 'special circumstances' indicating that she could not foresee or prevent the offensive conduct of her guest. [Citation.] According to the court, violent acts committed on the premises by household members can constitute 'cause' to terminate the tenancy, but there must be 'some connection between the tenant and the conduct underlying the termination.' [Citation.] The *Spence* court stated that '[a] determination to evict entire families for acts that they could not avert by any means, while it might not be arbitrary or irrational in the constitutional sense, is nevertheless contrary to the concept of fair and reasonable treatment implicit in the requirement of "cause." ' [Citation.]

Similar to the statutory language analyzed in *Spence*, paragraph

23(b) is clearly intended to give tenants such as Davis some measure of objective protection against termination absent a serious lease infraction. While we recognize that rule 22 of the lease also provides that a tenant may be held 'responsible' for the conduct of her guests and that this may result in a 'breach' of the lease, rule 22 must be read in a way that is consistent with paragraph 23(b), particularly since the language of the paragraph 23(b) is federally mandated. While we believe that there is nothing generally inconsistent in holding a tenant 'responsible' for the acts of her guests, we think that, at a minimum, the language employed by paragraph 23(b) demands that Davis *herself* have some minimum connection with the unlawful conduct before there can be said to be 'good cause' to evict her." (Emphasis in original.) *Diversified*, 257 Ill. App. 3d at 422.

The *Diversified* court then observed that, under the facts of the case, the only reasonable inference was that one of Davis's sons had hidden his use of drugs from his mother and that she had no knowledge of the contents of the duffel bag that contained the mixer-grinder. The *Diversified* court concluded that the trial court had correctly granted Davis's motion for summary judgment.

We agree with the *Diversified* court that the language in paragraph 23(b) should be read to require that the tenant have some minimum connection with the criminal activity before she can be evicted for "good cause." Here, the evidence clearly demonstrated that defendant had no knowledge of or involvement in the criminal activity that took place in her apartment on June 18, 1998. Thus, paragraph 23(b) does not support the trial court's finding in plaintiff's favor.

Finally, we address defendant's argument that the trial court erred in finding that she had control over her brother at the time the criminal activities occurred in her apartment. She maintains that there was no evidence to support this conclusion. Plaintiff responds by arguing that the trial court was correct in finding that Edward was under her control. Plaintiff cites several out-of-state cases that interpret the phrase "under the tenant's control" found in the federal public housing statute and certain federal regulations to include a guest of the tenant who was present in the tenant's apartment at his or her invitation.

Initially, we note that the term "under the tenant's control" does not appear anywhere in the subject lease. Thus, we see little relevance to this argument advanced by defendant. Moreover, both of the parties' attempts to use *American Apartment Management Co. v. Phillips*, 274 Ill. App. 3d 556 (1995), for their purposes are unavailing, as it is factually distinguishable from the appeal at bar. Under these circum-

stances, we find it unnecessary to delve further into this final argument.

For the reasons stated above, we reverse the judgment of the circuit court of Kane County and remand this cause for further proceedings consistent with this order.

Reversed and remanded.

BOWMAN, P.J., and COLWELL, J., concur.